CHARLES C. COOPER ET AL., APPELLEES, V. H. R. BANE ET
AL., APPELLANTS

FILED MARCH 27, 1923. No. 22231.

1. **Contracts:** EVIDENCE: PARTY IN INTEREST. A contract for the
benefit of a third person may be enforced by him, although it is
not made in his name and the consideration does not move from
him; in other words, the real party in interest may identify his
interest in the contract and enforce the same accordingly, and the
facts relating thereto may be proved by parol evidence.

2. **Guaranty:** CONSTRUCTION. The stipulation in the contract that "any
change or status by second party or notes representing bills re-
ceivable held by said Dunning State Bank at the time of the transfer
of said stock to second party (except by payment on principal)
shall relieve first parties from responsibility on note or notes so
changed," construed, and *held,* while the language of the clause is
somewhat obscure, the context on the whole indicates that the
"change" contemplated therein is in the status of the notes, and not
in the status of the person or persons handling the notes.

3. **Evidence:** SUFFICIENCY. The several issues of fact arising in the
case submitted to the jury under proper instructions, evidence
examined, and *held,* same supports the verdict.

APPEAL from the district court for Blaine county: BAYARD H. PAINE, JUDGE. *Affirmed.*

*Sullivan, Squires & Johnson* and *Hainer & Flansburg,* for appellants.

*Burkett, Wilson, Brown & Wilson, contra.*

Heard before MORRISSEY, C. J., GOOD, DAY and ALDRICH, JJ., RAPER and TROUP, District Judges.

TROUP, District Judge.

This case arises out of the consolidation of two banks at Dunning, Nebraska. The owners of the selling bank guaranteed its assets, and this suit is upon that guaranty. From a judgment against the guarantors, this appeal is taken.

The petition of the plaintiff, in substance, alleges that on June 1, 1918, the plaintiff entered into a contract with the defendants for the purchase of 100 shares of the capital stock of the Dunning State Bank, of Dunning, Nebraska, which said 100 shares comprises all of the stock issued and outstanding at that time. The contract is in writing and set forth in full in the petition, but we insert only such part thereof as we think needful to a proper consideration of the issues, as follows:

"Second. First parties represent all books, records and accounts of the said Dunning State Bank to be true and correct and agree to adjust any errors that may be found to have existed at the time of the transfer of the above stock to second party. First parties further represent all notes representing bills receivable held by said Dunning State Bank at the time of the transfer to second party of the within stock to be true in amount, genuine as to signature of maker, and guarantee the payment of said notes in the same proportion as the number of shares of stock herein sold bears to the entire capital stock, namely, 100 per cent. It is mutually understood and agreed that second party shall use due diligence in the handling and collection of said bills receivable and the said second party shall have fifteen days after maturity

of any note or notes representing bills receivable held by the Dunning State Bank at the time of the transfer of said stock to the second party in which to make collection of any note or notes representing such bills receivable, failing to collect the same within fifteen days after maturity and not wishing to extend or renew such note or notes the second party shall give notice in writing to first parties of his inability to collect such note or notes and first parties shall have thirty days from date of such notice in which to make such note or notes acceptable to second party, failing so to do first parties shall pay to second party in cash the full amount of such note or notes together with accrued interest thereon, and by so doing first parties shall acquire an interest in such note or notes equal to the amount so paid by them."

It was further stipulated in the contract that the notice to defendants of nonpayment of any notes covered by said guaranty, as above provided, shall be sufficient if mailed to A. C. Blanchard at Merriam, Nebraska, and that the contract shall be binding upon the heirs and assigns of all parties thereto.

The petition further alleges that the purchase price of said stock was paid in full, and the same, together with the assets of said bank, including the notes in suit, were delivered to plaintiff; that thereafter the things required by said contract to be kept and performed by the plaintiff were, in all respects, kept and performed; that thereafter the notes in suit, being among those guaranteed by defendants, became due and payable, and, the same remaining unpaid, the defendants were duly notified of the default and payment demanded and same refused by defendants, and prayer for judgment follows.

It appears that about 15 months after plaintiff commenced this suit he sold all his interest in the Home State Bank at Dunning, of which he was president and owning 90 per cent. of its stock, including all interest in the present suit, and removed permanently to the state of California. Thereupon the said Home State Bank

filed herein its petition of intervention, wherein it alleges that at all times it was and is the real party in interest in the purchase of the Dunning State Bank stock from defendants, as defendants well knew and understood at the time of entering into the transaction, and that it was agreed by all concerned that the contract therefor should be entered into by said Charles C. Cooper for and on behalf of the intervener herein, Home State Bank, said Cooper being then the president and largest stockholder therein, and that the purpose of said contract was that the assets of said Dunning State Bank were to become the property of said Home State Bank; that immediately upon the completion of the transaction the property of the Dunning State Bank became the property of the Home State Bank, the latter assuming the liabilities of the former, whereupon the former surrendered its charter to the state and became defunct, all of which was well understood and agreed to by defendants; that since said transfer certain notes included within said purchase, aggregating the sum of $5,330.53, became due and payable and remained unpaid; that notwithstanding plaintiff and intervener have kept and performed all things required of them under said contract to be kept and performed, and given defendants due notice of the nonpayment of said notes, defendants have failed and refused to pay the same, wherefore the intervener prays judgment.

The defendants, in their joint answer to the petition of intervener, admit the contract in question, but deny that Cooper entered into the same for and on behalf of the intervener; that they transferred said stock to Cooper, and not to intervener, and relied upon him personally because of their knowledge of him as a careful, energetic business man of long experience in the collection of commercial paper; they deny that either plaintiff or intervener used due diligence in any instance to collect the said notes, and deny all other allegations in said petition not otherwise admitted.

From the large volume of evidence taken and the

apparently formidable briefs filed, one's first impression is that the record probably presents some very difficult and intricate problems for solution, whereas, in fact, the questions involved are simple and easily determined.

The first complaint of the 16 assigned is that the court erred in overruling defendants' motion to strike the petition of intervention on the ground that it never had a legal standing in this action. Section 8552, Comp. St. 1922, settles this point against the defendants. See, in connection therewith, *State v. Farmers State Bank,* 103 Neb. 194, and *McConniff v. Van Dusen,* 57 Neb. 49.

The great burden of the defense seems to be that the contract between the contesting parties is that it was one so strictly personal to the plaintiff Cooper, as vendee, that the defendants have a right to demand that the duties to be performed by the vendee under the contract shall be performed by him and him only, and that any other than the plaintiff undertaking to perform the duties required, however faithfully said duties may have been performed in fact, will exonerate the defendants from all obligation to perform their part of the contract; a somewhat anomalous position to take, it would seem, in view of the very significant provision of the contract itself permitting assignment, as well as all the facts and circumstances surrounding the transaction as shown by the evidence. Counsel for plaintiff and intervener suggests that this defense is the result of an afterthought, and not an idea present in the minds of defendants at the formation of the contract, and as we read the evidence and view the whole situation we are strongly inclined to the same opinion. If, however, it appears, as a matter of fact, that the defendants did not contract with Cooper with a view of securing his personal attention to the collection and handling of said notes, and if it further appears, without serious dispute, that the person or persons who did handle them were as well or better qualified to do so successfully than Cooper could possibly be under the circumstances, then there is nothing left to

defendants' theory upon this point. One may be expected naturally to wonder to what appreciable extent the personal equation likely figured in the minds of defendants, when they knew the contract into which they were entering, and did enter, contained an express provision that the "same shall be binding upon the heirs and assigns of all parties hereto," and that the person with whom they contracted might undertake at least to assign said contract within 24 hours after its execution. This expression of wonder is all the more warranted from the incident shown by the evidence that as a matter of fact a like contract between defendants and another had been assigned to Cooper just prior to the execution of the present agreement. However this may be, we think the evidence clearly shows that defendants had no thought of reliance upon the personal knowledge of the subject-matter of the transaction by Cooper or his general acquaintance with the makers of the notes or the patrons of the bank when they were seeking a purchaser for their bank stock, for it is in evidence that very shortly before the execution of the present contract defendants sold 80 per cent. of the identical bank stock finally going to Cooper, through a brokerage house in Omaha, to a man in Council Bluffs, Iowa, whom they never saw nor heard of before, and whom they have never seen yet, so far as the evidence discloses, and entered into a contract with him identical with the present contract, so the evidence seems to show, except as the number of shares of stock. It was through an assignment of that contract by the Council Bluffs man to Cooper that the latter came to deal with defendants and make the contract in question. So it would seem defendants could not have had in mind, in the first instance at least, the selection of a purchaser upon whom, because of his acquaintance in the community and with the patrons of the bank, they relied personally to handle the bank's commercial paper, including the notes in suit. Besides, defendants knew that Cooper himself did not live at Dunning, and never did; he lived at

University Place, a suburb of Lincoln, Nebraska, and his
bank at Dunning, the Home State Bank, the intervener
herein, was handled by others, and by the same persons
who handled the notes in suit in their efforts to collect
same from the makers, to which persons and bank the
purchased assets of the Dunning State Bank were turned
over. Again, when the first of the guaranteed notes
became due and unpaid, defendant Blanchard, who by
appointment represented all defendants, was notified by
the intervener of the defaulted note and the same was
promptly paid by defendants to the Home State Bank.
So, likewise, with one or more other notes, until at one
time defendants refused payment because, as Blanchard
said, "thirty days not up;" and again, for a like reason,
and still again, and finally, because the guarantors had
no funds with which to pay, all the while corresponding
and dealing with the Home State Bank and receiving
letters written by the Home State Bank officials upon
the Home State Bank printed stationery, and at no time
until the answer was filed in this suit did defendants
intimate that they relied upon Cooper personally to handle
and collect the purchased assets of their bank. But, still
further, the question of whether the contract in suit was
the personal one of Cooper and was made by him for and
on behalf of Home State Bank, with full knowledge of that
fact by the defendants at the time, was submitted to the
jury and by their verdict they found the latter to be the
fact. This we think is equivalent to finding that de-
fendants did not intend or expect, that Cooper should be
obliged to give his personal attention to the handling or
collecting of the notes in question.

The question last above stated would then be the next
in order to be disposed of, and we have just said that
question was submitted to the jury, and that by their
verdict the jury found that the contract in question was
not the personal contract of Cooper, but that it was made
for and on behalf of Home State Bank, the intervener
herein, with full knowledge on the part of defendants at

the time it was being so made. We cannot take either the time or space to specifically point out all of the testimony in support of said finding; but, as an example of the evidence in that regard, it may be said that, not only is there direct evidence that Cooper told defendants, at the time, that the contract was made in behalf of his own bank, but that they well knew and understood that such was the only practical purpose and reason he had in making the purchase he did, namely, to close out the defendants' bank and consolidate the same with his own. Defendants knew that Cooper was the president of the Home State Bank; they surely did not suppose that he was buying their bank to continue it as a rival to his own. The finding of the jury on this point is amply supported by the evidence.

It might not be out of place here to remark, as was said in substance in the somewhat similar case of *Everson v. Gere,* 122 N. Y. 290, that if the intervener for whose benefit the contract was made fully complied with the obligations imposed upon it by the contract, the defendants having undertaken to pay the notes if the makers did not, it could make no difference to them whether they paid to Cooper or to some other person entitled to receive the same.

The next question naturally in order is: Did the Home State Bank, in whose charge the collection of the notes in suit in the first instance rested, through its officers and employees, fairly and fully perform the duties required of it by the contract? This question was also submitted to the jury for its determination and by its verdict it found that it had. We think this finding is sufficiently supported by the evidence.

Another assignment is that, the contract having been executed by Charles C. Cooper, the court erred in admitting oral testimony to show that it was in fact made for and on behalf of the Home State Bank. The rule is elementary that a contract for the benefit of a third person may be enforced by him, although it is not made in his

name and the consideration does not move from him. In other words, the real party in interest may identify his interest in the contract and enforce the same accordingly, and the facts showing him to be such may be proved by parol evidence. The cases declaring this doctrine are, of course, entirely too numerous to mention, but many of them may be found cited under 22 C. J. 1235, sec. 1648, and Mechem on Agency, sec. 769. Such evidence does not contradict the writing; "it only explains the transaction." *Ford v. Williams*, 62 U. S. 287. The following are some of the cases in our own state in which the general rule is announced: *Shamp v. Meyer*, 20 Neb. 223; *Norman v. Waite*, 30 Neb. 302; *Barnett v. Pratt*, 37 Neb. 349; *Doll v. Crume*, 41 Neb. 655; *Forburger Stone Co. v. Lion Bonding & Surety Co.*, 103 Neb. 202. In connection herewith see *Punta Gorda Bank v. State Bank*, 52 Fla. 399.

The defendants complain of the judgment rendered in the case, and claim it was entered without lawful authority and therefore void. We have carefully examined the grounds for this complaint, as disclosed by the transcript, and are satisfied that no error was committed by the court and no prejudice accrued to defendants by the manner in which the judgment was finally adjusted and entered.

The claim that defendants should be relieved from liability on the notes under the clause of the contract which provides that "any change or status by second party or notes representing bills receivable held by said Dunning State Bank at the time of the transfer of said stock to second party (except by payment on principal) shall relieve first parties from responsibility on note or notes so changed," because the notes were handled by the Home State Bank, the real party in interest, instead of by Cooper personally, is, we think, not well founded. While the language of this clause is somewhat obscure, we think that the "change" contemplated therein is in the status of the notes, and not the status of the person or persons

Cooper v. Bane.

handling the notes. The whole context, we think, indicates this. There is no evidence showing that the status of any of the notes which defendants were called upon to pay was changed in any respect from the time plaintiff received them until defendants were called upon to pay them.

Complaint is made to the giving or refusing of many instructions, but upon examination of the same we find that virtually all have been disposed of by the decision of the main issues and therefore no separate review thereof is required.

Finding no reversible error, the judgment of the district court is

AFFIRMED.

---

The following opinion on motion for rehearing was filed November 16, 1923. *Former judgment of affirmance vacated, and judgment of district court reversed.*

1. **Banks and Banking:** CONTROL. The affairs and business of a Nebraska banking corporation are under the control of a board of directors. Comp. St. 1922, sec. 8007.

2. ———: PURCHASE OF STOCK. Except "to prevent loss upon a debt previously contracted in good faith," a Nebraska banking corportion cannot purchase or hold the capital stock of another corporation, including that of a rival state bank. Comp. St. 1922, sec. 8006.

3. ———: SALE OF STOCK: CONSOLIDATION. A written agreement by officers of a state bank to sell its entire capital stock to the officers of a rival state bank does not necessarily imply a contract to consolidate the two banks, even where the sellers in their contract guarantee the assets transferred with the capital stock sold.

4. ———: ———: GUARANTY OF ASSETS. If an indivisible contract to sell all the capital stock of a Nebraska banking corporation to a rival state bank is invalid because executed in violation of statute, a guaranty of assets, inserted in the same contract as an incident of the sale, falls with the principal transaction.

5. ———: CONSOLIDATION. Two Nebraska banking corporations cannot consolidate without the consent of the department of trade and commerce. Comp. St. 1922, sec. 8021.

6. ——: ——: EVIDENCE. Evidence outlined in opinion *held* insufficient to prove an agreement by officers of two state banks to consolidate them.

7. **Opinion Withdrawn.** Opinion and syllabus reported in *Cooper v. Bane ante,* p. 74, withdrawn upon a reargument.

Heard before ROSE, DEAN and GOOD, JJ., REDICK, District Judge.

PER CURIAM.

This is an action on a contract of which the following is a copy:

"Contract and Agreement.

"This contract and agreement made and entered into by and between A. C. Blanchard and A. H. Metzger of Cherry county, Nebraska, William Fleishmann of Sheridan county, Nebraska, and H. R. Bane of Blaine county, Nebraska, parties of the first part, and C. C. Cooper of Lancaster county, Nebraska, party of the second part, witnesseth: That the first parties have this day bargained and agreed to sell, assign and transfer to the party of the second part and the second party has agreed to purchase and pay for 100 shares of the capital stock of the Dunning State Bank of Dunning, Nebraska, subject to the following terms and conditions, all of which are made a part of the consideration of this contract.

"First. The agreed price is fifty (50) dollars per share above actual value on date of transfer (said actual value to be determined by adding capital, surplus, undivided profits, guaranty fund, interest, exchange and all other items of credit due to the said Dunning State Bank, deducting therefrom all interest due on certificates of deposit, unpaid bills of expense, taxes and other items of expense owing by said Dunning State Bank). Payment for said stock shall be made by second party in the following time and manner: Three thousand (3,000) dollars cash at the time of signing this contract, receipt of which is hereby acknowledged by the first parties, balance (exact amount to be determined as above provided) at the time of the

Cooper v. Bane.

transfer of said bank stock to second party, which shall be on or before June 1, 1918.

"Second. First parties represent all books, records and accounts of the Dunning State Bank to be true and correct and agree to adjust any errors that may be found to have existed at the time of the transfer of the above stock to second party. First parties further represent all notes representing bills receivable held by the said Dunning State Bank at the time of the transfer to second party of the within stock to be true in amount, genuine as to signature of maker, and guarantee the payment of said notes in the same proportion as the number of shares of stock herein sold bears to the entire capital stock, namely 100 per cent. It is mutually understood and agreed that second party shall use due diligence in the handling and collection of said bills receivable and the said second party shall have fifteen days after maturity of any note or notes representing bills receivable held by the Dunning State Bank at the time of the transfer of said stock to the second party in which to make collection of any note or notes representing such bills receivable, failing to collect the same within fifteen days after maturity and not wishing to extend or renew such note or notes the second party shall give notice in writing to first parties of his inability to collect such note or notes and first parties shall have thirty days from date of such notice in which to make such note or notes acceptable to second party, failing so to do first parties shall pay to second party in cash the full amount of such note or notes together with accrued interest thereon, and by so doing first parties shall acquire an interest in such note or notes equal to the amount so paid by them. It is distinctly understood and agreed by both parties hereto that any change or status by second party or notes representing bills receivable held by said Dunning State Bank at the time of the transfer of said stock to second party (except by payment on principal) shall relieve first parties from responsibility on note or notes so changed.

"Third. First parties agree to resign in favor of second party all insurance, farm loan and other agencies for outside lines of business conducted in connection with the Dunning State Bank.

"Fourth. First parties agree not again to engage in the banking business in the town of Dunning, Nebraska, for a period of five years from the date of this contract under penalty of five thousand dollars ($5,000) liquidated damages to second party for violation of this paragraph of contract and agreement.

"Fifth. It is mutually understood and agreed that this contract shall be binding upon the heirs and assigns of all parties hereto.

"Sixth. Parties of the first part hereby agree that notice of nonpayment of any note or notes held as bills receivable by the said Dunning State Bank shall be sufficient if mailed to A. C. Blanchard at Merriman, Nebraska.

"Seventh. Parties to this agreement acknowledge the payment in full for amount due in the transfer of the stock of the said Dunning State Bank, Dunning, Nebraska, on this date.

"Made in duplicate, dated and signed at Dunning, Nebraska, this 1st day of June, 1918.

"(Signed) A. H. Metzger,

"A. C. Blanchard,

"W. Fleishmann,

"H. R. Bane,

Parties of the first part.

"C. C. Cooper,

Party of the second part.

"In Presence of P. Wilson."

Charles C. Cooper, named as party of the second part, commenced, as plaintiff, an action on this contract against defendants, H. R. Bane, A. C. Blanchard, A. H. Metzger and William Fleishmann, parties of the first part, February 17, 1919. Prior to June 1, 1918, Blanchard was president, Metzger vice-president, and Bane cashier

of the Dunning State Bank, a Nebraska banking corpora-
tion. In his petition Cooper pleaded that he performed
the contract on his part and received from defendants
pursuant thereto all the capital stock purchased by him
from them, being the entire capital stock of the Dunning
State Bank; that four of the notes which, under the con-
tract, had been guaranteed by defendants had not been
paid, the amount due thereon from them to him being
$7,760.23; that the failure of defendants to pay him the
amount due on these notes was a breach of the contract.
The relief demanded by plaintiff was judgment against
defendants for the sum stated.

After defendants assailed the petition of plaintiff by
demurrer and answer, the Home State Bank of Dunning,
also a Nebraska corporation, intervened August 5, 1920,
and filed a petition pleading for its own use and benefit
the identical contract pleaded by Cooper, making it part
of the petition in intervention. The defendants are the
same in both instances. In the two petitions the same
relief is demanded for breach of the same contract, except
that intervener pleads the failure of defendants to pay
three only of the notes described in plaintiff's petition,
the amount alleged to be due intervener from defendants
being $5,336.53, for which judgment is demanded.
Intervener, the Home State Bank, pleaded in substance
that June 1, 1918, it agreed with defendants to purchase
all the capital stock of the Dunning State Bank and thus
to merge its assets into the intervening bank; that
defendants then agreed to guarantee such assets; that the
sale and transfer of stock were made for and on behalf
of intervener through and in the name of Cooper, he being
then, and for a long time thereafter, intervener's principal
stockholder, its president, and a director; that, pursuant
to the contract, defendants assigned the capital stock of
the Dunning State Bank to intervener, it becoming the
owner and assuming the liabilities of the Dunning State
Bank, which became defunct: that intervener performed
its agreements, and that defendants breached their con-

tract by refusing to pay intervener the amount due it on the unpaid guaranteed notes.

In an answer to the petition of intervener defendants, among other defenses, denied that Cooper entered into the contract on behalf of intervener; denied that intervener was a party to the contract or a party in interest, and denied that defendants ever entered into any contract with intervener to sell their capital stock or to guarantee payment of the notes in controversy. Defendants pleaded further that Cooper had no authority to act for intervener in purchasing the capital stock of the Dunning State Bank, and that intervener could not lawfully, and did not, make such a purchase. A trial of the controversy between intervener and defendants resulted in a verdict in favor of intervener, upon which a judgment for $6,426.36 was entered. Defendants appealed. A hearing in the appellate court resulted in an affirmance on the grounds stated in a former opinion. *Cooper v. Bane, ante,* p. 74. Upon a motion by defendants for a rehearing, the case was reargued and again taken under advisement.

At the former hearing Cooper's authority to act for the Home State Bank, intervener, in purchasing the entire capital stock of the Dunning State Bank, the legality of such a purchase in view of a statute prohibiting it, and the sufficiency of the evidence to sustain a finding that defendants sold their stock to intervener, instead of to Cooper, were propositions controverted in the argument of defendants, but not discussed as determining factors in the opinion delivered. *Cooper v. Bane, ante,* p. 74. When the case was reargued, the negative of these questions was again presented by defendants and seems to require further consideration.

Disregarding the question whether a person not disclosed by a written contract may prove by parol that it was, for his benefit, entered into by a nominal party to the written instrument, the contract here in controversy is evidence that Cooper for his individual benefit entered

Cooper v. Bane.

into it with defendants. This is affirmatively shown by the writing itself and nothing to the contrary appears therein. The contract declares on its face that Cooper is the party of the second part. All the obligations assumed by defendants run to him individually without any reference to agency or to any other persons or corporation. Consistently with the terms of the instrument itself, it was signed by Cooper in his own name as the party of the second part. In their pleadings defendants and intervener alike rely on the contract—the former as written and the latter as shown by parol to express a mutual intention to make intervener the party of the second part, or the real purchaser of the capital stock of the Dunning State Bank. In absence of oral proof defendants would be entitled to judgment on the face of the written instrument.

Does the evidence show that Cooper had authority to act for the Home State Bank, intervener, in buying the capital stock of the Dunning State Bank? Though he was the principal stockholder, president and a director of intervener, he was not the bank itself. Buying the capital stock of a rival state bank was not an ordinary banking transaction within the powers of a stockholder, the president, or a single director, or all combined. The statute provides:

"The affairs and business of any banking corporation transacting business under the laws of this state shall be managed or controlled by a board of directors." Comp. St. 1922, sec. 8007.

There is no evidence that, in advance, intervener's board of directors authorized Cooper as an officer or a director or a stockholder or as an agent to buy the capital stock of the Dunning State Bank or to require defendants to guarantee payment of notes as assets acquired by means of the transfer.

Assuming that the acts of Cooper were the acts of the intervening bank, could the latter by itself or by Cooper

buy the entire capital stock of the Dunning State Bank? The statute declares:

"No corporation transacting a banking business shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, or the shares of any corporation, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith." Comp. St. 1922, sec. 8006.

The capital stock in the present instance was not purchased or held "to prevent loss upon a debt previously contracted in good faith." The execution of the contract, therefore, if shown by parol to have been entered into by Cooper for intervener, was forbidden by statute, and, if thus made, was illegal and unenforceable. It necessarily follows that intervener failed to show by parol or by the contract pleaded or by both that defendants legally sold the capital stock of the Dunning State Bank to the Home State Bank, the contract itself reciting that Cooper was the purchaser.

The position of intervener cannot be maintained by separating the guaranty and the transferred assets from the sale of the capital stock. The sale by which the assets were incidentally transferred and the guaranty are parts of an indivisible contract pleaded in its entirety by both intervener and defendants. Intervener, considered as the party which purchased the capital stock from defendant, acquired the assets by means of a forbidden illegal sale. Thus considered the transfer of the notes was a mere incident of the principal transaction. Neither the Dunning State Bank nor defendants indorsed the notes. Intervener, therefore, considered as the holder of the capital stock under an invalid purchase, cannot enforce the guaranty. In that situation the guaranty falls with the invalid purchase—the principal contract.

Did defendants in entering into the contract intentionally unite with intervener in a mutual understanding to consolidate the two banks? The statute declares that

Cooper v. Bane.

"no consolidation shall be made without the consent of the department of trade and commerce." Comp. St. 1922, sec. 8021. There is no proof that, prior to the execution of the contract, the banks, or either of them, had the consent necessary to consolidation. Defendants parted with their capital stock, transferred the assets of the Dunning State Bank to the purchaser, and resigned as officers without any permission to consolidate the two banks. Neither the shares of the capital stock of the Dunning State Bank nor the assets thereof were turned over to intervener while in the control of defendants. An assignment of each stock certificate was signed in blank by the owner, one of the defendants. The assets, including the notes in suit, were not indorsed by any defendant, or by the Dunning State Bank, but remained in that institution for ten days at least after the transfer of the capital stock. The contract was executed June 1, 1918. Immediately thereafter Cooper, at a meeting of the new stockholders, was elected president of the Dunning State Bank, one of his associates vice-president, and another cashier. In this election by the new stockholders of the Dunning State Bank, Cooper and his associates controlled its capital stock and assets as individual owners. As thus reorganized, the Dunning State Bank was conducted as a commercial banking institution in its original name until June 12, 1918. It was not definitely known until June 11, 1918, that the Home State Bank would purchase the stock and assets of the Dunning State Bank and agree to a consolidation. There is no proof whatever that the department of trade and commerce consented to a consolidation while defendants had an interest in the Dunning State Bank or the right to enter into an agreement to consolidate it with the Home State Bank. Considering the evidence in the light of the contract, reciting as it does in unambiguous language that Cooper was the purchaser, there cannot, in reason, be a finding that defendants mutually and intentionally agreed with intervener to consolidate the two banks and that they put their agreement

in the written instrument pleaded by all parties to this action. There is an inference, however, that consolidation was mentioned in the preliminary negotiations, and that one, or perhaps two, of the defendants had knowledge of a wish on the part of Cooper to consolidate the two banks. This falls far short of an agreement by defendants to unite with intervener in a mutual consolidation, even if the department of trade and commerce had consented thereto. Intervener did not make a case against defendants. The judgment against them cannot stand.

In view of the conclusion reached on these phases of the case, it is unnecessary to reexamine the principles of law announced in *Cooper v. Bane, ante,* p. 74, though criticised as unsound. The former opinion is withdrawn, the affirmance set aside, the judgment below reversed and the cause remanded for further proceedings.

REVERSED.