ADAM G. RENTSCHLER, APPELLEE, V. MISSOURI PACIFIC
RAILROAD COMPANY, APPELLANT.

FILED MARCH 23, 1934.   NO. 28768.

*Kennedy, Holland & De Lacy,* for appellant.

*J. M. Patton* and *Rosewater, Mecham, Burton, Hassel-quist & Chew, contra.*

· Heard before GOSS, C. J., ROSE and PAINE, JJ., and CHASE and ELDRED, District Judges.

PAINE, J.

This is an action brought to recover wages by a member of the Brotherhood of Maintenance of Way Employees against the Missouri Pacific Railroad Company, by reason of plaintiff being laid off at a time when he had seniority rights above an employee who was retained. The jury returned a verdict for $1,000.

Adam G. Rentschler, plaintiff and appellee, a member of

a bridge gang, was let out on account of a reduction of the forces. Plaintiff claims that this was contrary to, and in violation of, a written agreement, dated January 1, 1928, between the Missouri Pacific Railroad Company and the brotherhood to which he belonged, and that his seniority rights were superior to a member of the bridge gang who was retained in service. He therefore brought suit on said agreement, and claims as damages the loss of wages from the time he was let out.

The amended petition set out that plaintiff has for a long time been employed by the defendant railroad company as an iron worker in bridge gang No. 1, and that on September 13, 1930, he was discharged from service, while a member in good standing of the Brotherhood of Maintenance of Way Employees; that since January 1, 1928, there has been in full force and effect an agreement between the railroad company and the brotherhood, and certain paragraphs of said agreement are incorporated in the petition. That the seniority roster for the year 1930 listed the plaintiff, on January 1 of said year, and continuously until the time of his discharge, and after his name the date November 6, 1928, and listed W. Stone, another employee, as of March 1, 1929, such dates being their seniority under the written agreement, and plaintiff claims that under said roster he should not have been discharged until after W. Stone had been discharged. He alleges that he has fully complied with said agreement as to all hearings and appeals. That he is able and willing to continue in said employment, and that he has lost the salary he would have earned had he been retained according to the rules of seniority, as set out in said agreement. That, because of said unlawful discharge, he is now, on account of his age, forever barred from seeking future employment with any railroad company on account of the unlawful act of the defendant.

The amended answer admits the execution of the agreement January 1, 1928, between the carrier and the brotherhood; admits the employment of the defendant,

and his suspension on the date mentioned; alleges that W. Stone was the swing line man of a crew of a derrick car, and that, by custom and practice, the holder of such a position has not been subject to displacement on account of seniority by other workmen not trained in said capacity; admits that rule 3-a of said agreement provides: "When force is reduced, the senior man in the sub-department, on the seniority district, capable of doing the work, shall be retained." Defendant insists that plaintiff did not have the ability, training, and experience for the position of swing line man, and that the judgment of the defendant governed in such matters, and asks that the plaintiff's action be dismissed.

The defendant assigns as error the refusal of the court to direct a verdict for the railroad company, and the giving of instructions Nos. 2 and 8, and claims that plaintiff should not have resorted to courts until he had exhausted the arbitration plan of adjusting grievances provided in the contract.

The next proposition of law presented by the defendant is that a contract between a brotherhood and a railroad company does not establish a contract between the individual members of that brotherhood and the railroad company, a breach of which will sustain an action by the individual, and that mutuality is lacking between the parties to this suit.

The last proposition of law presented by the defendant for reversal is that if said agreement be construed as taking away from the management the question of the capability of an employee, and leaving the decision of that question with a jury, it is void as against public policy.

In the collective agreement between the union and the company, article 2 covers seniority, and rule 2 thereunder provides: "a. Seniority begins at the time the employee's pay starts. Rights accruing to employees under their seniority entitle them to consideration for positions in accordance with their relative length of service with the railroad."

A large part of the evidence, as disclosed in the bill of exceptions of nearly 200 pages, relates to the duties of a swing line man on a derrick car. It is clear that the issue contested in the evidence was whether the company was justified in retaining Stone and letting Rentschler out. It appears from the evidence that the crew of the derrick car, consisting of the engineer, fireman and swing line man, are simply employees of the same bridge gang, and two of them are under the engineer, and that the balance of the bridge gang work on the side of the track, or on the bridge being constructed, or wherever the pieces of steel to be moved happen to be.

The evidence shows that Rentschler's seniority is superior to that of Stone's, and that plaintiff had on former occasions filled the position of swing line man on this identical derrick, and had long been employed as an engineer on derricks, having a swing line man and fireman under his charge, and was qualified to perform the duties of a swing line man in the position in which W. Stone had been retained by the company. This evidence was very hotly contested, and submitted to the jury, and the jury by their verdict decided this question of fact in favor of the plaintiff.

The trial court, in instruction No. 7, said: "You are instructed that, even though you find from a preponderance of the evidence that the plaintiff was capable of filling the job as swing line man, still you cannot find for the plaintiff if you further find that the railroad company in the exercise of a reasonable discretion had reasonable grounds for believing that the plaintiff was not capable of filling said position, and that Stone was the better man for the job."

The consideration of this case requires this court, for perhaps the first time, to pass on the rights of parties under a collective agreement. A trade agreement, or a collective labor agreement, is a term used to describe a bargaining agreement entered into by a group of employees, usually organized into a brotherhood or union, on

one side, and a group of employers, or a corporation, as a railroad company, on the other side. Such agreement may be a brief statement of hours of labor and wages, or, on the other hand, it may take the form of a book, as exhibit 2, furnished to plaintiff in this case, or often an exhaustive pamphlet regulating, in the greatest minuteness, every condition under which labor is to be performed, and touching upon such subjects as strikes, lockouts, walkouts, seniority, apprentices, shop conditions, safety devices, and group insurance. In France such agreements are treated as contracts, while in America they were at first considered as binding in morals, but not in law, and few attempts were made to bring them before the courts. In fact, the term contract was rarely applied to them because, the majority of unions being unincorporated, they could not be competent parties to a contract. It is said that government reports show that, of the larger labor unions in 1929, only 14 out of 148 of them were incorporated. The public has always been greatly interested in these agreements because their purpose was to sustain proper relations between capital and labor, and thereby tend to prevent strikes, lockouts, or walkouts.

While no two of such agreements are alike and the decisions rarely set them out at length, yet the purpose of these collective agreements was, in general, to regulate hours of work and wages to be paid, yet the individual members of a union, while protected on these questions, could stop work at pleasure.

But in the following examination of cases it will be found that in the last 20 years an increasing number of cases have been brought before our courts, a few by brotherhoods, not as many by employers' organizations, but the great majority of cases have been brought by the individual employee. Relief has been refused when the employee was a member of the union, and the collective agreement was made a part of his individual labor contract. On the other hand, relief has been granted when an employee was not a member of the union, and the collec-

tive agreement was, upon the slightest of evidence, considered as adopted into the individual's contract. The only conclusion is that the decisions of our courts are in hopeless conflict, but the questions involved are so important, and the issues at stake so vital, that courts must not shirk the responsibility of a painstaking research of all the facts and law in each case presented to them.

One of the earliest cases involving rights under a collective agreement was that of *Hudson v. Cincinnati, N. O. & T. P. R. Co.,* 152 Ky. 711, 45 L. R. A. n. s. 184, Ann. Cas. 1915B, 98, in which case an engineer was discharged for a violation of the rules and brought action alleging it was in violation of the collective agreement. The court advanced the theory that the engineer's rights hung on his individual contract, of which the collective agreement between the brotherhood and the railroad company was merely a memorandum of rates of pay and regulations, and that this collective agreement was simply an ingredient of his own individual contract of employment. This case was decided March 11, 1913, and while but three cases are cited in the text of the opinion, the only case set out at length was *Burnetta v. Marceline Coal Co.,* 180 Mo. 241, decided in 1904, being a case brought against a coal company in a justice court for $21.57 wages at $2 a day. The testimony showed that Burnetta when hired said he understood the rules of the mine, and under that mere statement defendant sought to prove the collective agreement, but the trial court excluded the agreement and the ruling was upheld on appeal, the court saying that the plaintiff's statement that he understood the rules could by no means be construed to mean an agreement to labor under certain rules, one of which allowed pay to be withheld for two weeks, and that a contract to work is not to be inferred from the simple fact that he was a member of the organization which entered into an agreement, because persons work for themselves and are free and independent, and an agreement can only be enforced when the entire proposition has been stated and by them freely ac-

cepted. The real question at issue was whether the collective agreement had been adopted by Burnetta when he was hired.

Coming down a little later, we find the case of *Piercy v. Louisville & N. R. Co.*, 198 Ky. 477, 33 A. L. R. 322, decided by Turner, the commissioner of appeals, in 1923. This opinion followed the usage theory. Conductor Stanfill had been employed for more than 15 years, and successfully sought a declaratory judgment that he was entitled, under his seniority rights, to a particular day run under the terms of his employment. The railroad was indifferent, and had complied with the request of the Order of Railway Conductors, of which Stanfill was a member, to apply the seniority rule in the collective agreement so that it would give Stanfill a night run. The court of appeals affirmed the declaration of the lower court on the ground, first, that the action of the company does not appear to have been considered, either by the company or by the Order of Railway Conductors, as being a general change or modification of the collective contract. The Order of Railway Conductors merely requested the company to ignore the individual rights of the plaintiff. In the text appears this statement:

"The primary purpose in the organization of labor unions and kindred organizations is to protect their individual members and to secure for them a fair and just remuneration for their labor and favorable conditions under which to perform it. Their agreements with employers look always to the securing of some right or privilege for their individual members, and the right or privilege so secured by agreement is the individual right of the individual member, and such organization can no more by its arbitrary act deprive that individual member of his right so secured than can any other person."

The fifth paragraph of the syllabus says: "A trade union is not the agent of a member for the purpose of waiving any personal right he may have, but only for the limited purpose of securing for him, together with all

other members, fair and just wages and good working conditions." And the sixth paragraph of the syllabus reads: "An agreement by a member of a trade union to abide by its by-laws, rules and regulations, and to comply with the will of the lawfully constituted majority, does not require a member to submit to the determination of the union any question involving his personal rights."

In *Hall v. St. Louis-San Francisco R. Co.* (1930) 224 Mo. App. 431, plaintiff recovered damages for his discharge in violation of a collective agreement. The court say: "We can see no impropriety in any person or corporation who employs a large number of men who are members of a labor union making and being bound by an agreement made with the representatives of a labor union for and on behalf of the members of that union such as was entered into between defendant and the union of which this plaintiff was a member;" and held that the contract was binding and plaintiff was entitled to the benefit of its provisions.

In *Yazoo & M. V. R. Co. v. Webb,* 64 Fed. (2d) 902, in the third syllabus of this case, decided by the fifth United States circuit court of appeals, it is held that the contract between the employer and the employee, fixing wages and working conditions, ordinarily leaves the employer and individuals free to enter into particular contracts of employment, but both parties to such particular contracts are bound by the general contract as to wages and working conditions.

In the text in this decision, speaking of collective contracts, it says: "As a safeguard of social peace it ought to be construed not narrowly and technically but broadly and so as to accomplish its evident aims and ought on both sides to be kept faithfully and without subterfuge."

In itself, the collective contract is rarely subject to a court action because it is incomplete. It establishes no concrete contract between the employer and any employee. No one is bound thereby to serve, and the employer is not bound to hire any particular person. It is only an agree-

ment as to terms on which contracts of employment may be satisfactorily made and carried out. It is a mutual general offer, to be closed by specific acceptance. When negotiated by representatives of an organization, it is called collective bargaining, but ordinarily the laws of the order do not require the members to serve under it, but only that if they serve they will do so according to its terms.

When the collective agreement is published by the managers, it becomes then the rule of that industry. The agreed seniorities must be observed in promoting, laying off, and reemploying men.

When an employee brings into court a case concerning his individual rights under such an agreement, a question may be raised whether his employment comes under it.

In *Gary v. Central of Georgia R. Co.*, 37 Ga. App. 744, decided in 1928, a member of the Brotherhood of Locomotive Engineers, an unincorporated union, finally accumulated 90 demerits for blocking and delaying trains, and was automatically discharged, according to the rules. He brought suit against the company for $30,560. The company hired the plaintiff on a written contract, in which was included the rules of the Brotherhood of Locomotive Engineers, and although the contract made through the brotherhood was presumably a collective agreement, it was held that the petition stated a good cause of action.

One of the late cases is *Yazoo & M. V. R. Co. v. Sideboard,* 161 Miss. 4, released April 20, 1931. Charles E. Sideboard, a colored man, entered the employ of the railroad as a freight brakeman October 1, 1910, and worked four years, when he was transferred to passenger service, and served as porter and brakeman from 1914 to 1928. He objected at first to being paid only the wages of a porter while performing duties of a brakeman, but cashed the checks. For the last year he refused to cash the checks, and demanded pay of a brakeman. The time has at last arrived, said the court, when labor union contracts are no longer construed with hesitancy and strictness, but

are accorded the same liberality which is given to other agreements, so that while a few years ago courts were holding that an individual member of a labor union could not maintain an action for the breach of an agreement, as in the *Hudson* and *Burnetta* cases, the holdings now are that these agreements are primarily for the individual benefit of the members of the organization, and that rights secured by these contracts are individual rights, which may be enforced directly by the individual, citing *Gulla v. Barton*, 149 N. Y. Supp. 952; *Blum & Co. v. Landau*, 23 Ohio App. 426; *Cross Mountain Coal Co. v. Ault*, 157 Tenn. 461. This *Sideboard* case goes a step farther and involves the question of whether the appellee, who, being a negro, could not be a member of the union which made the the contract, but who had been governed in accordance therewith, could rely upon and sue for its benefits; in other words, is he, as a third person, such a stranger to it that he can have no enforceable rights under it? The court said that the contention that a third party may recover directly on a contract made expressly for his benefit is not an open question in this state, since *Canada v. Yazoo & M. V. R. Co.*, 101 Miss. 274. Many cases are cited on this subject in the notes, 13 C. J. 703-711; 6 R. C. L. 882-890, secs. 271-277; 2 Elliott, Contracts, sec. 1412; *Smyth v. City of New York*, 203 N. Y. 106. The reasoning of these cases is this: First, when the terms of the contract are expressly broad enough to include the third party, either by name, as one of a specified class, or, second, where the third party was evidently within the intent of the terms so used, such party will be within its benefits, if, third, the promisee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract.

In *West v. Baltimore & Ohio R. Co.*, 103 W. Va. 417, the court refused relief to a dissatisfied carman who brought action on seniority, not only because his claim had been rejected by the union, but also because he was not shown to be within the collective agreement, there being

no evidence that he voted for or ratified the contract under which he claimed seniority rights.

In the Canadian case of *Young v. Canadian Northern Ry.*, 4 D. L. R. 452, plaintiff machinist, after working seven years, was discharged in violation of the seniority rule established between the American Federation of Labor, to which he did not belong, and the railroad. The Manitoba Kings Bench, being the trial court, admitted that defendant, and probably the union, intended the rules of the collective agreement to apply to all of the workmen. Nevertheless, the court rejected plaintiff's claim on the ground that the union never assumed to speak for him, a nonmember.

In *Whiting Milk Companies v. Grondin*, 282 Mass. 41, an agreement between a union and the employer, preventing employee from selling dairy products, as the servant of another, to employer's customers for 90 days from cessation of employment, is held binding on a milk wagon driver who worked under the agreement as a member of the union.

Recently in several cases the theory has been advanced that a collective agreement is a valid contract. *Ribner v. Racso Butter & Egg Co.*, 238 N. Y. Supp. 132. There is good ground for the adoption of this conclusion, for the parties on each side, through their organizations as agents, have bound themselves to certain specific rights and duties, and Dean Roscoe Pound stated, in an address at the American Bar Association in 1919: "Human interests will assert themselves continually in new ways and significant institutions of every-day life often arise extra-legally and produce their most important results independent of or even against the law." American Bar Reports 1919, p. 453.

A still more recent case, decided December 14, 1932, is *Panhandle & Santa Fé R. Co. v. Wilson*, 55 S. W. (2d) (Tex. Civ. App.) 216. Here Wilson, a pumper at Littlefield, Texas, sued the company for wages lost during the period between his discharge and reinstatement. The

court held that, even though the employee was working under the terms of the trade agreement, he did not have a good cause of action because his discharge had been in accordance with its terms.

The field of inquiry on collective agreements has been carefully studied by several of the leading law writers, and enriched by their articles. Those which have been examined may be found in 10 St. Louis Law Review, 1; 41 Yale Law Journal, 1221; 44 Harvard Law Review, 572; 9 Ind. Law Journal, 69; 18 Va. Law Review, 185. Other citations, which cannot be referred to without making this opinion unduly long, are: *Keysaw v. Dotterweich Brewing Co.*, 105 N. Y. Supp. 562; *Saulsberry v. Coopers International Union*, 147 Ky. 170; *St. Louis, B. & M. R. Co. v. Booker*, 5 S. W. (2d) (Tex. Civ. App.) 856; *Langmade v. Olean Brewing Co.*, 121 N. Y. Supp. 388; *Gregg v. Starks*, 188 Ky. 834; 16 R. C. L. 425, sec. 10.

The claim is made on behalf of the railroad company that the contract is void for lack of mutuality, yet Nebraska has gone as far as any court in protecting a third person's rights under a contract, and if this court had taken the other view, and considered it only in the light of third person beneficiary, the case of *Cooper v. Bane*, 110 Neb. 74, has held: "A contract for the benefit of a third person may be enforced by him, although it is not made in his name and the consideration does not move from him; in other words, the real party in interest may identify his interest in the contract and enforce the same accordingly, and the facts relating thereto may be proved by parol evidence."

It is insisted on the part of the defendant that plaintiff, by submitting his grievance to arbitration, was bound thereby, and could not appeal to the court. It is claimed that, after several hearings on this matter, the last hearing reached by plaintiff resulted in a tie vote, and thereupon the plaintiff sought to protect his rights by bringing this action.

In the case of *Bell v. Western Railway*, 153 So. (Ala.)

434, it was said (quoting from *Western Assurance Co. v. Hall & Brother,* 112 Ala. 318): "The principle declared in these cases (*Bozeman v. Gilbert,* 1 Ala. 90, *Meaher v. Cox,* 37 Ala. 201, and *Wright v. Evans,* 53 Ala. 103) is that, when the agreement to arbitrate includes the whole subject-matter of difference, so that the right of the party to resort to the courts of his country for the determination of his suit or claim is absolutely and effectually waived, such an agreement is against public policy and void. We adhere to that conclusion. The courts clearly distinguish between an agreement which refers to arbitration the extent or amount of damages to be recovered, but leaves the parties free to have the right to recover or liability of the other party determined by the courts, and those agreements which refer to arbitration the authority to determine the right of the one to recover, or the liability of the other. The former are upheld and enforced, while the latter are declared to be against public policy and not binding. The policy of the legislatures of this state is to encourage the settlement of legal controversies by arbitration as far as can be done without contravening some principle of public policy. *Tankersley v. Richardson,* 2 Stew. (Ala.) 130; *Tuskaloosa Bridge Co. v. Jemison,* 33 Ala. 476."

Section 13 of the Nebraska Bill of Rights says: "All courts shall be open, and every person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy by due course of law, and justice administered without denial or delay." This point has been before our courts several times in reference to insurance policies and other similar contracts providing for arbitration, and in *National Masonic Accident Ass'n v. Burr,* 44 Neb. 256, this court stated in its opinion the following rule: "Whatever may be the rule elsewhere it is now the firmly established doctrine here that though the parties to a contract provide that if a dispute arise between them that such dispute shall be submitted to arbitration, refusal to arbitrate or no arbitration is not a defense to

an action brought on such a contract by one of the parties thereto, as the effect of such agreement is to oust the courts of their legitimate jurisdiction and is contrary to public policy and therefore void. This was the rule announced in the *German-American Ins. Co. v. Etherton*, 25 Neb. 505. It was followed in *Union Ins. Co. v. Barwick*, 36 Neb. 223, and again reaffirmed in *Home Fire Ins. Co. v. Bean*, 42 Neb. 537."

The jury found from the evidence that plaintiff was as well qualified to handle the job as Mr. Stone. The contract between the union and the railroad company was limited to just one year, and therefore expired at the end of a year, and plaintiff could only recover for that period, and the evidence shows that he could have earned over $1,500, but the jury returned a verdict of only $1,000, which is sustained by the evidence.

We have examined the instructions given the jury, as well as considered all of the assignments of error, and we find no reversible error therein. The judgment of the trial court is

AFFIRMED.

ROSE, J., dissents.