JACKSON, *ex dem.* TEN EYCK and others, *against* FROST.

Natural objects control courses and distances, in the description of land in a patent.

The east line of the Halfmoon patent, running from the Mohawk to the Hudson river, should touch the source of Anthony's kill.

The map of a patent made by the proprietors, is inadmissible as evidence against the proprietors of an adjoining patent.

EJECTMENT for a lot of land in the Halfmoon patent, in the county of Saratoga, tried at the circuit in that county, December 29th, 1823, before WALWORTH, C. Judge.

At the trial, the plaintiff deduced a regular title under the Halfmoon patent, to Andreas Ten Eyck, who received a conveyance of the premises in question, September 25th, 1767, and died in October, 1802; having devised them to the lessors of the plaintiff.

The patent of Halfmoon was proved.   It bore date the 30th May, 1687; and granted to Anthony Van Schaick in fee as follows: " a certain parcel or tract of land purchased of the Indians, proprietors, by license from the governor lying and being to the north and above the town of Albany; and is commonly called and known by the name of Halfmoon, which stretches up alongst the North River, from a certain place where are several streams of water, to a creek or kill, where there is a fall of water, which running into the land,

The legislature have not the power to determine the rights of parties to land; either by themselves or commissioners, without the consent of the parties.

To constitute such an adverse possession as will bar a right of entry, it must be accompanied with what the law will consider, *prima facie,* a good title.

Where one entered, and possessed land, claiming it as a gore between two patents; *held,* that this was not such an adverse possession as would bar the true owner's right of entry; though continued for more than 20 years before ejectment brought.

The declarations of a tenant, that he has a deed, are inadmissible, even to show in what character he claims; as whether adversely or not.

hath his course into the North River; the said creek or kill and fall, being, by the Indians, called Tienwenendah-ow, (now Anthony's kill); and from thence runs up the Maqueas kill, (now Mohawk river,) westward to a place called Dowaelsoiaex; and so strikes presently eastward, up alongst by the said streams of water and then to the North River afore mentioned; together with three small islands, lying in the said river, over against the tract or parcel of land called the Halfmoon aforesaid."

It appeared, that a line from the mouth of Anthony's kill directly to the Dowaelsoiaex, as run by the commissioners hereinafter mentioned, would exclude the premises in question from the Halfmoon patent. But if run from the source of Anthony's kill, it would include them. The defendant insisted on the first, as the true line; but the Judge adopted the last.

The defendant then produced certain petitions to the legislature, purporting to be signed by the proprietors of the patents of Halfmoon, Clifton Park, and Kayaderosseras; and an act of the legislature pursuant to these petitions, passed in 1793, (noticed more at large in *Jackson* v. *Davis*, ante 123,) appointing commissioners to settle certain disputes about the boundary lines of these patents. The award of the commissioners was also produced, according to which the premises in question are not in Halfmoon patent. It appeared, however, that Andreas Ten Eyck, did not sign the petitions, or either of them, on which the statute was founded; and that by a subsequent act, in 1795, (vid. also *Jackson* v. *Davis*, ante 123) the legislature declared, that no person claiming title to land in these patents, by lease or purchase in fee simple, and who did not unite in the application for the appointment of commissioners, should be bound by their determination.

The defendant also offered in evidence a map of the patent of Kayaderosseras which joins Halfmoon patent dated November 12th, 1770, to show that the premises in question, were in Clifton Park patent, which was rejected by the Judge.

The defendant then proved that one M'Alpin occupied

the premises in question in 1795, claiming them as his own saying they were in a gore; which, therefore, belonged to the settlers; that M'Alpin was in possession 25 years before the trial, and more than 20 years before the suit was commenced; that about 25 years before the trial he exchanged farms with one Miller, now deceased.

The defendant offered to show by Miller's declarations, that he had a deed from M'Alpin; which evidence was objected to, and excluded by the Judge.

The defendant then proved that Miller remained in possession 12 or 15 years, whence the possession passed through several hands down to the defendant.

The widow of Miller swore that when her husband exchanged with M'Alpin, he took a quit claim deed from M'Alpin, who said he thought he had a good title; that no rent had been claimed or called for; and the premises in question were not included in any of the patents; that this was 27 years before the trial; that she could not, read; did not see any deed executed; but M'Alpin agreed to give one and her husband had a paper which he said was a deed from M'Alpin.

The Judge charged that the plaintiff had made out a sufficient title and location; and that the defendant had failed in establishing a bar by adverse possession.

Verdict for the plaintiff.

*J. L. Viele*, now moved for a new trial; 1. Because the premises in question were not situated within the Halfmoon patent;

2. Because the proof offered by the defendant was improperly rejected;

3. Because the defendant made out a sufficient adverse possession to bar the action;

4. Because the Judge misdirected the jury.

5. Because the verdict was against law and evidence.

He cited 1 John. Rep. 163; Ballantine on limitations, 19, 21; Espinasse's Evidence, 195, 6; *Jackson* v. *Wheat*, (18 John. 40.)

*S. G. Huntington & A. Van Vecten,* contra, cited 2 John. Rep. 382 ; 3 id. 375 ; 4 id. 202 ; 6 id. 257 ; 7 id. 556 ; 10 id. 381 ; 18 id. 490 ; 2 id. 382 ; 15 Mass. Rep. 153 ; 3 John. Cas. 101 ; 1 Phil. Ev. 182 ; note (*a*) and the cases there cited ; 1 John. Rep. 159, 340 ; 4 id. 230 ; 6 id. 19 ; 10 id. 377 ; 2 Day. 127 ; 3 Cruise, 346, sect. 33, 4, 5 & 6 ; 5 id. 213, sect. 13 ; 1 Cowen, 276.; 9 John. Rep. 163.

*Curia,* per Savage, Ch. J.   The only difficulty in locating the patent, arises from the last course running from the Mohawk river to the Hudson.   The commissioners ran a straight line to the Hudson, at the mouth of Anthony's kill, by which they disregarded the course, " up alongst by the said streams of water, and thence" to the North River.   It is perfectly well settled, that natural objects must control courses and distances.   Although, therefore, the course is, " and so strikes presently eastward ;" yet, we must take the whole together, adding, " up alongst by the said streams of water."   What streams ?   Not the Mohawk, for the course leaves it : not the Hudson, for it ends there, after passing " up alongst by the said streams."   The only other stream is Anthony's kill.   I think, therefore, the plain location is as if the words, " presently eastward," had been omitted. It would then be, "and so strikes up alongst the said streams of water, and thence to the North river."   Had such been the language, it seems to me, there would be no dispute about the location.   The line must run to the source of Anthony's kill.   The premises in question are, of course, included.

The Judge was correct in excluding the map of the Kayaderosseras patent.   The introduction of it would only show that the proprietors of that patent claimed to the commissioners' line ; and after the award in their favor, they were justified in so claiming, against all who entered into the submission ; but surely not against such as never assented to it.   The legislature never intended, that the award should be valid against those who held property in severalty, in the disputed tract, but had not signed the petition. (*Jackson* v. *Davis,* 5 Cowen, 135.)

But even had the legislature undertaken to settle this con troversy themselves, without any submission, it will not be contended, that they had power to do so. If the grant conveyed to Halfmoon the territory in dispute, the proprietors had a vested interest, which the legislature could not divest, without their consent. If they had not this power as to the whole collectively, they had it not as against a single individual. The only object which the legislature could have had, was to give their sanction to the acts of the parties. If they attempted any thing more, they clearly were assuming powers, which belonged to another branch of the government. If they converted themselves into a court of law, their acts, in that assumed capacity, were unauthorized by the constitution, and of course not binding on the parties.

The lessors of the plaintiff, then, having shown the legal title to be in them, and having never consented that their rights should be adjudicated upon, or interfered with, by the commissioners, or any body else, come now to demand their property, as if no such proceedings had ever taken place; and they are entitled to have it restored, unless they are barred by the statute of limitations.

The defendant, and those under whom he claims, have had possession for a sufficient length of time. The only difficulty is, as to the character of that possession. Was it adverse? M'Alpin was the first possessor; he claimed it as his own. Why? It was a gore; no rent had been demanded; and it of course belonged to the settlers. This amounts to saying that he claimed it, because he had no title; for if it was a gore, then the land belonged to the state. The idea that rent could be demanded, presupposes a landlord, and of course, an owner. The deed to Miller was given with this parol abstract of the title; it was not that he owned the land, because the fee was vested in him by purchase, or descent; but it was his, because there was no other owner. This is no title on which to rest an adverse possession. The purchaser, who took such a deed, knew that what he purchased amounted to nothing; for he was bound to know it.

I am aware that it was said in the case of *Jackson* v. *Thomas*, (16 John. 301,) that " if a man enters on land,

without claim or colour of title, and no privity exists between him and the real owner, and such person afterwards acquires what he considers a good title, from that moment his possession becomes adverse." This doctrine must not be understood as authorizing the purchaser to consider a naked possession a good title. It must be, as I understand the law, such a title as the law will, *prima facie, consider a good title*. Otherwise there would be no uniformity. The character of the possession might be made to depend upon the understanding of the tenant; and the same possession, which would be a good defence to one, would be worthless to another. And hence a possession under a French grant was held not to be adverse, because such a grant could not possibly be the source of a good title.

The possession of Miller, therefore, seems to me to be merely a continuation of M'Alpin's possession, with no greater rights, but precisely of the same character. Admitting, therefore, that the possession of Miller's grantee was adverse, the length of time is not sufficient to bar the plaintiff.

In my opinion, the plaintiff is entitled to judgment.

Judgment for the plaintiff.