[File No. 6109.]

BENEDICT BICHLER, Respondent, v. NICKOLAUS TERNES, Appellant.

(248 N. W. 185.)

Opinion filed April 10, 1933.

*Coventry & Thompson,* for appellant.

*F. M. Jackson* and *Morrison & Skaug,* for respondent.

BIRDZELL, J. This is an appeal from a judgment quieting title in the plaintiff to a plot of ground 208.71 feet square in the southwest corner of Section 11, Township 130, North of Range 77, West of the 5th P. M., in Emmons county, measured so as to exclude strips 33 feet wide on the south and west sides of the square which are in the established highways, and further adjudging that the plaintiff has no right, title or interest in and to the said 33 foot strips. The action is here for trial de novo. The essential facts may be stated as follows:

In a community known as Krasna in Emmons county, there are a church, a school, a store and several residences. These radiate from the southwest section corner of section 11, township 130, range 77. In 1915 the southwest quarter of this section was owned by Nickolaus Ternes and for a stated consideration of $45 he deeded by warranty deed a square acre, more or less, to Michael Braun. In the deed the land conveyed is described as follows: Beginning at the southwest corner of the southwest quarter of section 11, township 130, range 77, thence running east along the south line of said section 208.71 feet, thence north 208.71 feet at right angles and parallel to the west line of said section, thence west 208.71 feet measured at right angles and parallel to the south line of said section and thence south 208.71 feet to the place of beginning, containing one acre more or less.

Nickolaus Ternes at the time lived approximately a mile north and half a mile east of the land described in the deed and had occasion frequently to go to Krasna. Following the conveyance, Michael Braun and the parish priest went upon the premises and measured off 208.71 feet square, using as a starting point the intersection of the north and east lines of the two highways. Braun built a residence and fenced the land so measured on the north and the east, thus enclosing an acre exclusive of the 33 foot strips between the enclosure and the section lines in the middle of the highways. Through mesne conveyances describing the premises as they were described in the original deed, the title now stands in the name of the plaintiff in this action who is in possession. During the time intervening the first conveyance and the conveyance to the plaintiff, additional improvements had been placed upon the land in the shape of new fences, two small barns and a garage. The two barns are situated within two or three feet of the fence on the north side of the premises and the garage was situated near the

fence on the east side. About the year 1926, Nickolaus Ternes built a house adjacent to the premises in question north of the Braun house and occupied it as his residence until his death in 1928, utilizing the ground to the north of the fence as his garden, while the Brauns were utilizing the ground to the south of the fence in a similar manner. When the plaintiff purchased the Braun premises the garage was excepted from the conveyance and was moved off. Michael Braun, the original grantee, died shortly after conveying the premises in question to his children, Michael and Faustinus Braun, and Leokadia Engel. Thereafter the premises were conveyed to Dionysius, a son of Michael, Jr., and by him deeded to the plaintiff. The defendant in this action is the son and successor in interest of the original grantor. There is evidence in the record to the effect that the original grantor during his lifetime contended that the premises fenced by Michael Braun included more ground than was conveyed.

In the complaint two causes of action are set forth. The first is a cause of action for the reformation of the deed on account of an alleged mutual mistake in the description, consisting in the fact that the parties had agreed to convey one acre beginning at a point 33 feet north and 33 feet east of the section corner, whereas the scrivener drew the deed so as to call for an acre beginning at the southwest corner of the section, similar mistakes occurring in the subsequent conveyances. The second cause of action is alleged in the usual form of an action to determine adverse claims to the acre within the enclosure.

The defendant's answer denies all the allegations of the complaint with respect to mutual mistake, admits that the plaintiff is the owner of the land described in the various deeds, and as to the second cause of action he alleges he is the owner of all the southwest quarter of Section 11, except the tract described in the deeds. Simply stated, the plaintiff claims to be the owner of one acre of ground exclusive of the 33 foot strips along the west and south, and the defendant contends that the plaintiff owns one acre of ground including the 33 foot strips and, consequently, that the fences and other improvements encroach upon his land to the extent of 33 feet on his south and west boundaries.

At the trial the plaintiff offered no evidence to prove the allegations of the complaint respecting mutual mistake in the description, but, in addition to proof of title through the deeds, evidence was offered

which in the opinion of the trial court established an estoppel against the defendant to assert his title to any land included within the plaintiff's enclosure.

The judgment determines the plaintiff to be the owner in fee simple of the following described property and quiets title to the same in him as against the defendant, to-wit: "Beginning at a point 33 feet north and 33 feet east of the Government mound or monument at the southwest corner of Section 11, Township 130, North of Range 77, West of the 5th P. M., Emmons county, North Dakota; thence east parallel with the section line on the south side of said Section 11, a distance of 208.71 feet; thence north parallel with the section line on the west side of said Section 11, a distance of 208.71 feet; thence west parallel with the south line of said Section 11, a distance of 208.71 feet; thence south 208.71 feet to the place of beginning, containing one acre, more or less."

In a memorandum opinion, after discussing the authorities bearing upon the doctrine of estoppel and acquiescence, the trial court said:

"The question then is whether Nickolaus Ternes by his conduct placed the plaintiff here, Benedict Bichler, in such a position that it would be inequitable now to take away from him the 33 foot strip of ground that is in dispute. It seems to the court that it would hardly be fair to this plaintiff to permit the defendant now after the lapse of all these years to eject the plaintiff from this 33 foot strip of ground. The original fence was built in the year 1916. Nickolaus Ternes knew within a short time that the fence was not on the proper place, according to his views. He permitted Michael Braun, his immediate vendee, to occupy the premises until his death. He permitted all of the occupants to use and enjoy the entire tract as originally fenced without taking any active steps to remove them, and making apparently only verbal protests at intervals. It seems to the court that the time when Nickolaus Ternes should have acted was when his son-in-law, Dionysius Braun, moved upon the place. That was in 1925. At that time Dionysius Braun tore down the old fence and put up a new one. He also moved two barns, or erected two barns, upon the disputed strip, and built a garage upon the disputed strip. Nickolaus Ternes himself moved onto the adjoining tract and built a house there. By acquiescing in the use of the premises as they were used there during all those years, Nickolaus Ternes put it in the hands of his vendee and his suc-

cessors to deceive an innocent purchaser. Any one going to view the property with the intention of buying it would naturally conclude that the fence was the boundary line, and a man like Benedict Bichler, who had known that that was the boundary line for so many years, would naturally take it for granted that he was buying the property within the fence, and the court can well believe that he would not have purchased the ground if he had known that this 33 foot strip was not included. Nickolaus Ternes, Sr., must have known something about the sale of this property by his son-in-law, Dionysius Braun, to Benedict Bichler. That was the time when he should have spoken, when he should have interfered and asserted his rights to this tract. Perhaps he did not care to do that for fear he would spoil the sale for his son-in-law. But if he stood idly by and permitted such a sale without warning the purchaser of his claim to the property, surely he should not be permitted after the sale was actually made, and after the purchaser had been deceived into the quantity of property that he was getting, that he could then assert his claim. It is true that the description of the land is the same in all the deeds. But among these people, who are German-Russians, with very little education, and who perhaps can hardly read, it is not surprising that Benedict Bichler did not discover that the description in the deed did not coincide with the description of the tract which he bought, and there is nothing strange that he did not know that the measurement of the 208.71 feet should have commenced in the center of the highway and not at the fence corner. If he had been an experienced man, and an intelligent man, a man well able to read the deed and discover the error, then perhaps he would have been guilty of contributory negligence, and would not have been able to profit by the silence of Nickolaus Ternes. But the court feels here that one of two innocent men must suffer, and if that is the case, then the man who is responsible for the position in which the plaintiff finds himself should be compelled to stand the loss. The court cannot help but feel that that man is Nickolaus Ternes. That by his laches, carelessness, negligence and neglect, and by his permitting the vendees to use the land with every appearance of ownership for a period of 13 or 14 years, he and his heirs and vendees are now estopped from asserting adverse title to this property.

"It is therefore the view of the court that the title to this 33 foot

strip in dispute should be quieted in the plaintiff, that the title to the 33 foot strip of highway on the south and west of this acre tract should revert to the defendant, and that possibly the best way to .adjust the matter would be to make an exchange of deeds between the parties, so that the title to the tract may be clear and unambiguous."

Since the evidence offered by the plaintiff tends to establish the facts as stated in the opinion of the trial judge, and as no evidence was offered by the defendant, it will be assumed, for purposes of this opinion, that the facts are as stated. We are concerned here only with the legal effect of what was done.

Counsel for the respondent do not contend here that they have made out a case for reformation of the deed on account of mutual mistake, but they urge that the judgment is right upon one or more of three grounds: (1) that the deeds should be construed as conveying the land which was later enclosed by the fences, that is, one acre exclusive of the strips in the highways; (2) that the grantor and his successor in interest have acquiesced in the dividing line upon which the fences are constructed; and (3) that in any event the defendant is now estopped to assert that any other line is the true boundary.

"The starting call of a description, being more important than any other call, usually controls any other call with which it is in conflict, for it is supposed that a mistake in regard to that is less likely to occur." 4 Thomp., Real Prop., § 3133.

"Corners marked by stakes control courses and distances. Although stakes are monuments liable to be displaced or removed, they control so long as it is certain that they mark the corners of the original survey. . . .

"Points marked by the original stakes and monuments placed by the government surveyors, if they can be found, or the place where they can be identified, govern . . . ." 4 Thomp., Real Prop., § 3138.

The description in question specifically refers to the southwest corner of the southwest quarter of section 11. This clearly identifies as the starting point the section corner which is located at the intersection of the south and west lines of the section in the center of the intersection of the two highways. By no permissible construction can this starting point be moved to a point 33 feet north and 33 feet east of the section corner referred to. Counsel cite as parallel with the case at bar and

rely upon the case of Wegge v. Madler, 129 Wis. 412, 109 N. W. 223, 116 Am. St. Rep. 953.

The property conveyed in that case was platted, and it does appear that the court held the "northwest corner of lot 1" referred to in the description should be treated as located at the point of the intersection of the south and east lines of two streets at the northwest corner of lot 1 and not the point of intersection of the center lines of the streets. In reaching that conclusion, however, the court was influenced apparently by its previous decisions holding land within the recorded plat of any city or village owned and occupied by a debtor as a homestead to extend to a quarter of an acre exclusive of the public street upon which it abutted. The court did not profess to depart from the rule of Gove v. White, 20 Wis. 425, which is cited with approval. The description in the Gove case is more analogous to that in the instant case. The description in that case read: "commencing on the road at the northwest corner of section eleven, in town six, north of range nineteen east, in the Milwaukee land district; thence south on the road dividing sections ten and eleven, sixteen rods; thence, at right angles with said road, and parallel with the north line of said section, twenty rods, to a stake; thence, at right angles, and parallel with the west line of said section, to the road leading from the first named corner to the house of said E. Gove, sixteen rods; thence west along the line of said road, twenty rods, to the place of beginning—containing two acres." The road first mentioned was four rods wide and its center line was the north and south line between sections ten and eleven. Concerning this description the court said (page 454):

"In this case there are no express words limiting the grant to the side of the highway. The language of the deed is: 'commencing on the road at the northwest corner of section eleven in town six,' etc., 'then south on the road dividing sections ten and eleven,' etc. It appears from the survey that the corners and dividing lines of sections ten and eleven correspond with the center of the highway. Here then we have the starting point from which the quantity of land is to be measured.

"Another rule is, that where there is a known and well ascertained place of beginning, in the description in a deed, that must govern, and the grant be confined within the boundaries given. Jackson ex dem.

Craigie v. Wilkinson, 17 Johns. 146; Jackson ex dem. People v. Wendell, 5 Wend. 142, 8 Wend. 183.

"Still another rule is, that what is most material and most certain in the description of the property granted, has a controlling influence. A river, a known stream, a spring, or a marked tree, will control as to courses, distances and quantities. Jackson ex dem. Young v. Camp, 1 Cow. 605; Doe ex dem. Arden v. Thompson, 5 Cow. 371; Jackson ex dem. Ten Eyck v. Frost, 5 Cow. 346; Jackson ex dem. Roberts v. Ives, 9 Cow. 661; Wendell v. Jackson, 8 Wend. 183, 22 Am. Dec. 635. A highway, opened and used as such, is a most material and certain object in the description of land. The same is true of the corner of a section, at which the surveyors of the public lands are required by law to establish a monument.

"Here, then, we have two most material and certain and well ascertained objects in the description, showing the place of beginning—the center of the highway is described in the deed, and the corner of the section as established by the public survey. From this well ascertained place of beginning there can be no departure."

Another case quite in point is Henderson v. Hatterman, 146 Ill. 555, 34 N. E. 1041, where the description called for "that certain piece or parcel of land commencing on the southwest corner of lot nine (9) of Ure's subdivision of part of the southeast quarter of section thirty (30), township forty-one (41) north, of range fourteen (14) east, of the third principal meridian; running thence northeasterly, along the Indian boundary line, four (4) chains and thirty-three (33) links; thence running north one hundred eight and 16/100 (108 16/100) feet; thence running west two hundred and thirty-two and 98/100 (232 98/100) feet; thence running south two hundred and sixty-five and 88/100 (265 88/100) feet to the place of beginning,—meaning and intending hereby to convey one (1) acre of land, without reference to metes and bounds as above described." In interpreting this description the court was guided by the presumption that the owner of the land adjoining a highway intends to convey his interest in the highway and that the intent to exclude the highway must clearly appear from the language of the deed. See 9 C. J. 195–197. Where not clearly excluded, the deed would necessarily carry title to the grantee to the

strip which is in the highway, subject of course to the public easement. In light of this presumption the court said (page 1043 of 34 N. E., 146 Ill. 555):

". . . Where is the starting point in this description? The appellants contend that the 'southwest corner of lot 9' is in the north line of the road; that is to say, 33 feet north of the center of the road, or of the Indian boundary line. If this be so, the description is an impossible one, because, after leaving the starting point, the course must be along the Indian boundary line. The words are, 'running thence northeasterly, along the Indian boundary line, 4 chains and 33 links.' The Indian boundary line is 33 feet south of the 'southwest corner of lot 9,' if that corner is in the north line of the road. To commence at a starting point thus located, it would be necessary to jump to a point 33 feet south thereof, in order to carry out the succeeding portion of the description. . . . We therefore think that the southwest corner of lot 9 must be regarded as located in the center of the Indian Boundary Line road, or in the Indian boundary line, at the intersection of that line with the center line extended of the street west of lot 9. . . . It is well settled that monuments control courses and distances, and the courses and distances control the quantity of land."

Concerning the interpretative portion of the description ("meaning and intending hereby to convey one acre of land, without reference to metes and bounds as above described"), which it was contended showed an intention to convey one acre of land exclusive of the highway, the court said (page 1044):

"But, if the words quoted should be construed as having the effect claimed for them, they do not necessarily amount to an express agreement to convey one acre north of the Indian Boundary Line road. They are consistent with the intention to convey one acre north of the Indian boundary line; that is, one acre including the north half of the road, being a strip 33 feet wide and 4 chains and 33 links long."

A decree giving to the appellant one acre, inclusive of the 33 foot strip, was affirmed.

Still another case somewhat analogous is that of Cochran v. Smith, 73 Hun, 597, 26 N. Y. Supp. 103. There the deed conveyed to the plaintiff an acre of land commencing at the northwest corner of the grantor's premises at the junction of an avenue and a road, from

which corner the property was described by metes and bounds. As in the Illinois case, the court approached the question in light of some well recognized presumptions. Note the following (26 N. Y. Supp. 104, 73 Hun, 597):

". . . In the first place, it is an established inference of law that the proprietors of land adjoining a public highway are the owners of the fee thereof. Wager v. Troy Union R. Co. 25 N. Y. 526. Also, that a conveyance of land bounded by a highway carries with it the fee to the center thereof, as part of the grant. Bissell v. New York C. R. Co. 23 N. Y. 61. Of course, such presumption may be surmounted by evidence. When a road or an unnavigable stream of running water is used as a boundary in a grant, the title will pass to the center of the road or stream, unless there be something in the grant to indicate a contrary design. A road is regarded as a line, and its center, in such cases, is the true boundary, in the absence of other indications. Mott v. Mott, 68 N. Y. 252; White's Bank v. Nichols, 64 N. Y. 71. Concerning the description, the court said (26 N. Y. Supp. 105, 73 Hun, 597):

". . . Here the place of beginning being the junction of Fairview avenue and the Bayport road, and the presumption being that the grantor of the plaintiff owned to the center of both roads, the place of beginning is the point at the junction of the center line of the two roads. Holloway v. Delano, 64 Hun, 27, 18 N. Y. Supp. 700. From that point the line runs southerly 'by' the avenue; and, so in obedience to the rule we have stated, it runs with the center thereof. Then, returning, when the Bayport road is reached, the line runs 'by' that road, and so by the center line of the same. The language is plain, and free from obscurity, and our conclusion from it is in accordance with all the adjudicated cases and the elementary writers." See also 9 C. J. 202.

We are of the opinion that the deeds in the instant case cannot be construed so as to give to the respondent one acre of ground exclusive of the 33 foot strips on the south and west. The deeds clearly describe a square acre, more or less, measured from a starting point fixed by the government survey as the intersecting section lines or the southwest corner of the section. It will be noted that under all the authorities the description employed in the instant case necessarily conveyed to the grantee Ternes' title to the 33 foot strips which had been dedi-

cated to the highways, so that in no event could that portion of the judgment be supported which would require the plaintiff to convey to the defendant these strips. See Salter v. Jonas, 39 N. J. L. 469, 23 Am. Rep. 229; Paul v. Carver, 26 Pa. 223, 67 Am. Dec. 413; Healey v. Babbitt, 14 R. I. 533.

Is the defendant concluded under the facts in the instant case by such acquiescence as the record shows in the boundary line as evidenced by the fences? We are of the opinion that this question, too, must be answered in the negative. The evidence shows that the original grantor claimed the grantee had fenced in too much land. It also appears that the boundary was established at the fences without the concurrence of the grantor. So, there is no agreement in fact upon the boundaries as evidenced by the fences. Neither does it appear that the parties had compromised a disputed boundary line by agreement upon a definite line, or that such a line had been established through arbitration or otherwise. Thus, the question resolves to whether or not an erroneous line established by the grantee must be held to be the true line where the grantor adversely interested occupies his premises only up to such line and takes no steps to regain possession of his land erroneously claimed by the grantee for a period of sixteen years.

The most the record shows is that there was acquiescence in the existence of the fence and occupancy by the adjoining owners respectively up to the fence only in the sense that no affirmative action was taken to cause its removal. This alone does not amount to an agreement upon the fence as the dividing line. Dauberman v. Grant, 198 Cal. 586, 246 Pac. 319, 48 A.L.R. 1244. For purposes of this opinion, it may be conceded that an agreement between adjoining proprietors followed by acquiescence and possession would be conclusive upon both parties as fixing a boundary line different from that called for in the deed, though such possession and acquiescence continue for a shorter period than the statute of limitations. See 9 C. J. 236, 237. Where there is no agreement, however, unless the circumstances create an estoppel, nothing short of adverse possession for the statutory period will work a change of title (see Hanlon v. Ten Hove, 235 Mich. 227, 209 N. W. 169, 46 A.L.R. 788) or preclude one from asserting his title.

Pomeroy, in his work on Equity Jurisprudence, regards acquiescence

as a principle that works in analogy to estoppel in some instances where there is not a true estoppel to assert rights of property or of contract. He terms it "a quasi estoppel" upon the rights of remedy. 2 Pom., Eq. Jur., 4th ed., § 816. "Acquiescence," says Pomeroy, "in the wrongful conduct of another by which one's rights are invaded may often operate, upon the principles of and in analogy to estoppel, to preclude the injured party from obtaining many distinctively equitable remedies to which he would otherwise be entitled. This form of quasi estoppel does not cut off the party's title, nor his remedy at law; it simply bars his right to equitable relief, and leaves him to his legal actions alone. In order that this effect may be produced, the acquiescence must be with knowledge of the wrongful acts themselves, and of their injurious consequences; it must be voluntary, not the result of accident, nor of causes rendering it a physical, legal, or moral necessity, and it must last for an unreasonable length of time, so that it will be inequitable even to the wrong-doer to enforce the peculiar remedies of equity against him, after he has been suffered to go on unmolested, and his conduct apparently acquiesced in. . . . This effect of delay is subject to the important limitation that it is properly confined to claims for purely equitable remedies to which the party has no strict legal right. . . . Acquiescence consisting of unnecessary delay after such knowledge will defeat the equitable relief." Section 817.

Viewing the record in the present case in the light most favorable to the plaintiff, the acquiescence shown could not affect the defendant's legal title. Clearly, it could not operate to preclude the defendant from asserting his legal title to the disputed strips when it is attacked by another. He is not the actor. He has not taken the initiative and sought the aid of a court of equity to enforce his legal claims. So, the merits of the respondent's case are reduced to the contention that the defendant is truly estopped.

An estoppel arises from the conduct of a party and may be predicated upon silence or omission as well as upon written words. 2 Pom. Eq. Jur. 4th ed., § 802. "Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed or been enforceable by other rules of the law, unless prevented by the estoppel; and its practical effect is, from motives of equity and fair

dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel." 2 Pomeroy, supra. An estoppel goes deeper than the principle of acquiescence. It does not stop at the remedy. It affects the substantive right and is frequently recognized on the law side as well as the equity side of a court.

The elements of an estoppel such as will preclude an owner from asserting his title to land are: "(1) That the person sought to be estopped has made an admission or done an act with the intention of influencing the conduct of another, or that he had reason to believe would influence his conduct inconsistent with the title he proposes to set up. (2) That the other party has acted upon or been influenced by such act or declaration. (3) That the party will be prejudiced by allowing the truth of the admission to be disproved." 3 Washb. Real Prop. 6th ed., § 1894, quoted from Brown v. Bowen, 30 N. Y. 541, 86 Am. Dec. 406. See 2 Pom. Eq. Jur. 4th ed., § 805.

In the Wisconsin case of Gove v. White, cited above, there was testimony to the effect that the plaintiff had said to the defendant's grantor when the latter was contemplating the purchase of the two acres in question, Wright (grantor of the plaintiff) "has got two acres in his enclosure without the road" and more to the same effect. Later when the defendant purchased, the plaintiff suggested measuring the land out and the two measured. Later the defendant built a fence and a barn which extended on to the disputed piece. It was contended that these circumstances estopped the plaintiff to insist upon the true boundary line which would give to the defendant approximately two acres including the highway, rather than two acres excluding it. In disposing of the question of estoppel, the court said (20 Wis. 430):

". . . One essential element of every equitable estoppel, by which a man is to be precluded from claiming what is his own, is that the purchaser and party claiming the benefit of such estoppel should have been ignorant of the true state of the title. Ignorance of the true state of the title on the part of the purchaser must concur with wilful misrepresentation or concealment on that of the owner. The purchaser must not only be destitute of all actual knowledge of the true state of the title, but of the means of acquiring knowledge by a recourse to the record or in any other manner, according to the language of many of the authorities. See 2 Smith's Lead. Cas., Doe v. Oliver, — Dutchess

of Kingston's Case, Hare & Wallace's notes, 661, 662, and cases cited. Judge Downer was in possession of the deed from Gove to Wright, and familiar with its contents. The terms of the deed were unambiguous, and the rights of the parties under it plain and evident. It was in law the sole evidence of the extent of the grant, and whether the two acres conveyed were inclusive or exclusive of the highways. To the deed, therefore, in connection with the monuments upon the land referred to and identified by it, the parties were bound to resort for the purpose of ascertaining the extent of the grant. It seems to us, under such circumstances, that the declarations of the grantor as to the effect of the deed or the extent of the grant can never operate as an estoppel. If made without fraud and without any intention to deceive or mislead, of which we have no evidence to the contrary here, such declarations can amount to no more than an expression of opinion upon the legal effect of the deed, of which the purchaser, with the same knowledge of the facts, is equally well qualified to judge for himself. The rule of law in such cases is, that both parties must exercise diligence and good faith; and the purchaser must rely upon his own knowledge of the facts, and draw conclusions for himself. He cannot be permitted to say that he was misled or deceived by the mistakes or ignorance of the grantor. To allow the declarations of the grantor, in such a case, to overcome the deed and enlarge the grant would likewise be in direct contravention of the statute of frauds."

There is much more in the above case on which to predicate an estoppel than is present in the instant case. There is not a suggestion here of any word or act of the defendant's predecessor in interest that was in any way responsible for misplacing the supposed boundary fence or of any recognition by him of that fence as the boundary line except that he occupied the land only up to the fence. If the plaintiff was deceived at all he was deceived by physical appearances which were not created by the defendant or his predecessor in interest.

The description in the deeds of the plaintiff and of his grantors was unambiguous, and it was incumbent upon him, as it was upon the original grantee, to determine the extent of the grant. There is no evidence that the defendant or his predecessor was guilty of any misrepresentation or fraudulent concealment concerning the boundary line or any other conduct upon which the plaintiff or his predecessors in

interest could reasonably have relied as against the description contained in the deeds. Hence, there was no estoppel. It follows that the judgment must be reversed and the cause remanded with directions to enter a judgment in accordance with this opinion.

In view of the facts as disclosed by the record, we feel amply warranted in incorporating in the judgment a condition that will prevent the defendant from becoming unjustly enriched to the extent of the improvements that have been placed upon his property in good faith by the former owners to whose interests the plaintiff succeeds. The conclusion that the defendant's title to the land in question has not been affected by conveyance, acquiescence, or estoppel, does not entirely dispose of the equities between these parties so far as improvements are concerned. Where an occupant of real property has made improvements in the honest but mistaken belief that he was the owner, courts of equity have long recognized the propriety of requiring restitution for such improvements to be made as a condition of granting equitable relief to the true owner. See Woodward, Quasi Contr. § 187. And courts of law have in certain cases, as in actions for the recovery of rents and profits, recognized the right of a defendant to set off or recoup the value of improvements so made. While at common law the ownership of the improvement follows the ownership of the land, for purposes of doing equity it is sometimes virtually severed and this though there be no equitable title in the one who made the improvements. Thus, in Hunter v. Coe, 12 N. D. 505, 97 N. W. 869, where one made improvements upon land which had been conveyed to him when he had actual knowledge of an outstanding, unrecorded contract, he was allowed compensation for the improvements. Although his right to the property was subject to that of the contract holder, he had nevertheless made the improvements in good faith under a mistaken belief as to his rights. When sued for specific performance he was protected to the extent that the improvements so made enriched the true owner, the plaintiff. True, all the defendant asks here is a dismissal of the action, but nevertheless the true effect of the judgment will be to quiet title in him and enable him to peaceably repossess the property which he and his predecessor long suffered to be occupied by another. It appears to us that justice will be done by providing in the judgment

that the plaintiff be permitted to remove the barns and fences from the premises at any time within sixty days after the remittitur goes down.

NUESSLE, Ch. J., and CHRISTIANSON, BURR and BURKE, JJ., concur.