AGNES G. ENGLE BRISBIN, APPELLANT, V. E. L. OLIVER LODGE NO. 335, BROTHERHOOD OF RAILWAY CLERKS, ET AL., APPELLEES.

279 N. W. 277

FILED APRIL 15, 1938. No. 30115.

518

*Fischer, Fischer, Fischer & Fischer,* for appellant.

*Rosewater, Mecham, Shackelford & Stoehr, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ.

MESSMORE, J.

This is an appeal from the district court for Douglas county, wherein the court granted a temporary restraining order against the defendant brotherhood and its officers, restraining them from interfering with the employment of the plaintiff, who was working as a stenographer in the office of the auditor of miscellaneous accounts of the Union Pacific Railroad Company. The trial court dissolved the temporary restraining order and denied a temporary injunction. Plaintiff elected to stand upon the showing made, and an order was made denying a permanent injunction, from which order the plaintiff brings this appeal. The pleadings properly present the issues necessary for a determination of this case.

The evidence discloses that plaintiff, an unmarried woman, entered the employ of the Union Pacific Railroad Company at its headquarters in Omaha, Nebraska, July 5, 1923. She voluntarily became a member of the Clerical Employees' Association, a company union, in November, 1931. The union, acting as agent for the plaintiff and other member employees, entered into an agreement with the Union Pacific Railroad Company that no married woman thereafter would be employed, and that all married women then in the employ of the railroad company would be discharged. The plaintiff was secretly married at Papillion, Nebraska, on September 23, 1933. The union to which plaintiff belonged practically ceased to function, and on December 6, 1933, an election was held under the railway labor act, passed by the United States congress, to decide who should represent the clerical employees. The Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, a voluntary association of individuals, received the highest number of votes and became, by virtue thereof, the representatives of the clerical employees. The agreement relative to married women was still in full force and effect, and from the time of the selection of said brotherhood all agreements with the Clerical Employees' Association were terminated, and all employees were notified that a new agreement would be negotiated with the brotherhood. The plaintiff claims that she was not, and never had been, a member of the brotherhood and did not receive a notice of any kind that the agreement concerning the employment of married women was to be made a part of the new agreement. In this connection it might be well to state that the officers of the brotherhood, in cooperation with the railroad company, at all times previously and at this time, by oral agreement and by action of such officers, maintained and kept in force the so-called married women's agreement. This occurred just subsequent to the election at which the brotherhood was chosen to represent the clerical employees. There appear

to have been in the neighborhood of 150 agreements of different kinds, some of which were lost, made by the Clerical Employees' Association during its existence, but the one of interest in the case at bar is the married women's agreement.

The record discloses that there were 1,954 votes cast on the question of who should represent the Clerical Employees' Association, of which the brotherhood received 1,001. As to this election in December, 1933, and the plaintiff's participation therein, we find the following testimony by plaintiff: "Q. Now, you knew that there was an election in December, 1933, did you not, as between the clerical union and the new union called the brotherhood, the election among employees as to which union they wanted to represent them? A. Yes, sir. Q. You voted in that election, did you not? A. Yes, sir. Q. As a matter of fact you knew all about the brotherhood and you made application for membership in the brotherhood? A. Yes; I did." Exhibit 4,. offered and received in evidence, is an application for membership in the brotherhood signed by the plaintiff.

Plaintiff remained in her employment, using her maiden name and concealing her marriage, until October, 1936, when it was discovered that she was a married woman. The representatives of the union, upon such discovery, notified the immediate superior of plaintiff. The letters requesting that she be taken out of the employment of the railroad company are in evidence. Plaintiff was given 30 days' notice, at the end of which time her employment would be terminated. She applied for a restraining order which was granted. When such order was dissolved the railroad company discharged plaintiff.

Several women employees of the railroad company, upon marrying, had voluntarily terminated their employment with the company, except in one instance when a leave of absence was granted, and subsequently such employment was terminated. The result was to advance the plaintiff in her seniority rights. In this connection the

seniority rights of employees of the railroad company had been in effect for some period of time. Plaintiff contends that it was a rule of the company and not of the unions. However, the unions participated in the rights relative to seniority, and on July 1, 1934, a set of rules became effective governing the working conditions of clerks and other office, station and store employees, represented by the brotherhood, which appears as exhibit 2 in the record. These rules do not 'contain the married women's agreement. Exhibit 5 is a seniority roster of employees in the office of the auditor of miscellaneous accounts, to be issued as of January 1, 1935, containing the seniority numbers of some 79 employees, their positions, seniority dates and the individual's approval of the seniority dates shown. The plaintiff approved her seniority date, signing her maiden name thereto.

After the termination of her employment, plaintiff and her husband talked to certain officers of the brotherhood, requesting that an exception be made in her case, but did not appear before the lodge itself. The brotherhood refused this request. There is some evidence in the record, given by the plaintiff, to the effect that she was told by officers of the brotherhood that if she was not a member of the brotherhood it would be difficult to make such exception, for the reason that they had refused to make such an exception in favor of members of the brotherhood. This statement is denied. The trial judge had the benefit of testing the credibility of the witnesses in this conflict of evidence. The record further discloses the enforcement of the married women's rule, and that no discrimination was shown by the union or brotherhood in enforcing this rule as a representative of the Clerical Employees' Association, as among any of the employees of said association or brotherhood. The "open shop" was maintained by the Union Pacific Railroad Company and the defendant, E. L. Oliver Lodge No. 335, which is a voluntary association of individuals created for the purpose of furthering the interests of its members as em-

ployees of the railroad company in the city of Omaha, and affiliated with the American Federation of Labor.

Exhibit 7 is the original memorandum and agreement between the Union Pacific Railroad Company, the St. Joseph and Grand Island Railway Company and the Clerical Employees' Association, and is the agreement which gives rise to this controversy. It is as follows:

"In accordance with request of the General Committee of the Clerical Employees' Association—UPRR and StJ& GIRy., in connection with the unemployment situation, it is agreed that the following will govern with respect to the employment status of married women, effective November 23, 1931.

"1. Married women residing with their husbands shall not hereafter be employed in positions coming within the scope of the agreement between the Clerical Employees' Association and the Union Pacific Railroad Company and the St. Joseph and Grand Island Railway Company, effective February 1, 1930, or as hereafter amended.

"2. Single women now in service or hereafter employed, who marry, will not thereafter be considered as coming within the scope of agreement with the Clerical Employees' Association, will forfeit all rights thereunder, and shall be dropped from the service within not to exceed thirty days following date of their marriage.

"3. Married women residing with their husbands and who are now in the service or on leave of absence, shall not be permitted to exercise seniority under the provisions of the Clerical Employees' Association, where it will result in displacing an employee with dependents.

"4. Exception to the foregoing may be made by mutual agreement between the representatives of the management and the General Chairman of the Clerical Employees' Association, where it is desired to give employment to the wife of an employee who is incapacitated for service."

The plaintiff contends that the district court erred, and, in stating such alleged errors, takes exceptions to

the findings of the court and special finding No. 2 of the court's order, also to findings numbered 3, 6, 7, 8, 9, 10 and 11; that the findings are not sustained by the evidence and are contrary to law.

Plaintiff contends that she, by virtue of the action of the brotherhood, was deprived of a valuable property right, in that she lost her seniority right covering a period of 13 years and was denied the right to earn a living, a right guaranteed by the Constitution of the United States and by the Constitution of the state of Nebraska, claiming, in effect, that the contract relative to employment of married women, and as evidenced by exhibit 7, is in restraint of marriage and against public policy. In this connection plaintiff cites section 42-203, Comp. St. 1929, as follows: "Any married woman may carry on trade or business, and perform any labor or services on her sole and separate account; and the earnings of any married woman, from her trade, business, labor, or services, shall be her sole and separate property, and may be used and invested by her in her own name." Plaintiff also cites section 1, art. I of the Constitution of Nebraska, as follows: "All persons are by nature free and independent, and have certain inherent and inalienable rights; among these are life, liberty and the pursuit of happiness;" and section 3, art. I of the Constitution of Nebraska: "No person shall be deprived of life, liberty, or property, without due process of law;" and a list of authorities, among which is the case of *Cameron v. International Alliance of Theatrical Stage Employees, etc.*, 118 N. J. Eq. 11, 176 Atl. 692, 97 A. L. R. 594. The case cited involves interference with the liberty of contract wherein a motion picture operators' union classified its members into senior and junior groups, not basing such classification on skill and experience, and assessing a rate against junior members of such union greatly in excess of that imposed upon the senior members; denied the right of participation of junior members in the formulation of the policies of the union in the management of its business,

and gave the senior members preferred rights in the event sound pictures became a failure. This practice was condemned by the courts, in that it interfered with the personal liberty and property right guaranteed by the Fifth Amendment of the federal Constitution. In this case it was said: "The personal liberty and right of property guaranteed by the Fifth Amendment of the federal Constitution embrace the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for the sale of one's own labor." Without pursuing this case further, we are convinced that it is, in no respect, analogous to the case at bar.

Plaintiff cites *Parker Paint & Wall Paper Co. v. Local Union No. 813*, 87 W. Va. 631, 105 S. E. 911, wherein a union sought, by influence and intimidation, to interfere with a contract made between an employer and employees, and such interference by influence and intimidation caused breach of the contract and discharge of the employees from performance thereunder. The case was decided on the principle, as stated in the opinion (p. 639) : "If one person wantonly or maliciously, whether for his own benefit or not, induces a person to violate his contract with a third person to the injury of that third person, an action will lie,"—citing *Thacker Coal Co. v. Burke*, 59 W. Va. 253. At page 641 it was said: "A man's labor is his most sacred asset. It is often his only capital, and as long as he exerts it without injury to others, government will protect him." No such situation arises in the case at bar, as compared with the cases above cited, and we can accept the principle of law announced therein. *Erdman v. Mitchell*, 207 Pa. St. 79, 56 Atl. 327, and *Kinane v. Fay*, 111 N. J. Law, 553, 168 Atl. 724, cited by plaintiff, hold to like effect.

Plaintiff cites several cases on her proposition of law No. 2, which she states as follows: "One who without justifiable cause induces an employer to discharge an employee is liable for the wrong, even though the contract of employment is terminable at will." Among the cases cited

under this proposition is *DeMarais v. Stricker*, 152 Or. 362, 53 Pac. (2d) 715, wherein it was held: "To render an act which interferes with another's employment a violation of his rights, there must be intention to bring about particular result, use of unlawful means, and absence of justification." Other cases are cited on this proposition of law, holding to like effect.

We believe that there is not here involved any question concerning the right of this plaintiff under the state or federal Constitution to earn a living; nor is there involved any question as to whether, in a proper case, equity will protect by injunction the property right of women in their employment as against unlawful and unjustified interference by strangers; nor is there involved any question of due process of law, meaning a party shall have his day in court.

As to whether or not this married women's contract, exhibit 7, is against public policy and in restraint of marriage, we find in the Restatement, Contracts, sec. 581, a concise, well-stated rule that apparently governs such contract: "A bargain not to marry, or to be subject to loss or deprived of profit in case of marriage, or a bargain to hinder or prevent the marriage of another, is illegal, unless the bargain is otherwise reasonable and the restraint is incidental to another lawful purpose of the bargain." Among the illustrations cited we find the following: "A employs B, an actress, who promises to work as such for one year. B also promises not to marry during that time, and A's promise to employ is conditional on her refraining from marriage. B marries during the year. A can refuse to continue the employment and maintain an action for damages." We find also the case of *Grimison v. Board of Education*, 136 Kan. 511, 16 Pac. (2d) 492, which is an action by a school teacher to recover for breach of contract for employment to teach school, when in May, 1931, the plaintiff contracted with the board of education to teach school for the ensuing year. The contract specifically provided that the mar-

riage of the teacher during the period of the contract would terminate it. The plaintiff married in June of the same year, and when school commenced in September the board of education refused to permit her to teach. The court held that such contract was not in restraint of marriage. ﹒

In *Crowder-Jones v. Sullivan,* 9 Ont. L. R. 27, 4 Ann. Cas. 729, it was held: "Plaintiff for several years had been housekeeper for a widower with a young daughter, and being about to be married, he promised her, if she would continue in his service as housekeeper so long as he needed her and abandon her contemplated marriage, he would either pay her $1,000 in cash, give her a promissory note for $1,500, or remember her in his will. The plaintiff thereupon abandoned the marriage and continued her service until her employer's death, which occurred four years afterwards, he, in the meantime having given her a note for $1,500. In an action against his administrator on the note: *Held,* that the primary object of the agreement was the continuing in the intestate's service, the restraint of marriage being merely an incident thereto, and that, under all the circumstances, the restraint was not such an unreasonable one as could be said to be contrary to the policy of the law."

In *Ansorge v. City of Green Bay,* 198 Wis. 320, 224 N. W. 119, the Wisconsin court held:

"Plaintiff entered into a contract to teach in the vocational school at Green Bay for the ensuing school year, by the provisions of which she agreed that her contemplated marriage would not take place prior to the Christmas holidays, and then only upon thirty days' notice, and that if it did not take place during the holidays it would be postponed until after the close of the school year. Plaintiff had knowledge of the unwritten policy of the board of industrial education not to employ married women as teachers. *Held,* that plaintiff was rightfully discharged upon her marriage during the latter part of January. * * *

"The action of the board in discharging the teacher after her marriage does not contravene the provisions of sec. 6.015, Stats., recognizing the freedom of women to contract the same as men."

In *Kloberg v. Teller*, 171 N. Y. Supp. 947, it was held: "A contract, to be void as against public policy, should be quite clearly repugnant to the public conscience."

Under the facts in the case at bar, we do not believe that there was any interference on the part of the brotherhood to such an extent that the plaintiff's rights were violated, nor was there an intention to bring about a particular result by the use of unlawful means in the absence of justification. She agreed with the group of employees with which she associated herself, and they with her, that in the event of marriage they would terminate their employment. Her action was purely voluntary, —a contract, we believe, which she had a right to make. The evidence in this case conclusively shows that the plaintiff, by her conduct and acquiescence, is estopped from asserting such contract as being against public policy, and it is not necessary for a determination of this case to decide whether or not the married women's contract is in restraint of marriage or against public policy.

Plaintiff contends that she was not a member of the brotherhood which was selected to represent the Clerical Employees' Association, of which she was a member; that under the agency theory she would be bound by any agreements made between the employees' association and the railroad until such time as the agreements would be abrogated; further, that the courts have held that this theory of agency is the only theory upon which the individual employee is bound by the contracts entered into by his union and the employer, and cites in this respect *Rentschler v. Missouri P. R. Co.*, 126 Neb. 493, 253 N. W. 694. The cited case is the first expression of this court on a collective bargaining agreement and a recognition of the validity of such agreements in the state of Nebraska. It was there held: " 'Collective labor agreement'

and 'trade agreement' are terms used to describe a bargaining agreement, as to wages and conditions of work, entered into by groups of employees, usually organized into a brotherhood or union, on one side, and groups of employers, or corporations, such as railroad companies, on the other side." As to the effect of the contract, it was held in that case: "Such a collective agreement, being a general offer, becomes a binding contract when it is adopted into, and made a part of, the individual contract of each employee. A breach of its terms will give rise to a cause of action by either party." As to the method of construing the contract, it was held: "The terms of the collective agreement, as included in an individual labor contract, ought not to be construed narrowly and technically, but broadly, so as to accomplish its evident aims and protect both the employer and the employee."

Plaintiff's contention in this respect follows: That she was a party to and a member of the Clerical Employees' Association at the time of the execution of the married women's agreement on November 23, 1931; that in December, 1933, a notice was published that the old agreements with the Clerical Employee's Association were at an end and that new agreements would be negotiated; that the Clerical Employees' Association would be served with a 30 days' notice of the termination of the agreement with that association; that the brotherhood would be advised that the management would undertake the negotiation of an agreement with the association during the interim. Plaintiff's contention is that the notice abrogated the former agreement and terminated all the side agreements, and it was then necessary to agree formally by the brotherhood and the railroad company that notice would be given to the employees who were affected thereby, the plaintiff not being a member of the brotherhood, and that such agreement, bringing back into force and effect the married women's agreement of November 23, 1931, was orally made between Fred Graham, general secretary and treasurer of the board of adjustment of the

brotherhood, and C. J. Connors, in charge of labor for the railroad company; that the side agreements would be in force and effect; that no notice of such rules was given to anybody, and, therefore, this contract was not carried over into the new brotherhood. In this connection plaintiff cites *Piercy v. Louisville & N. R. Co.,* 198 Ky. 477, 248 S. W. 1042. This case involved the seniority rights of a railroad conductor, but the principle of law announced, and as contended for by plaintiff, follows: "A trade union is not the agent of a member for the purpose of waiving any personal right he may have, but only for the limited purpose of securing for him, together with all other members, fair and just wages and good working conditions." It was also held: "The officers of trade unions are not to be deemed the agents of the members of the unions with respect to the individual rights of the members, since the purpose of the union is primarily to procure agreements with employers for the benefit of the members of the union, and not to affect the rights of the members secured by such agreements."

The transportation act of 1920 was superseded by the railway labor act of 1926 (44 U. S. St. at Large, p. 577): The labor board in its order No. 119, issued April 14, 1921, promulgated rule 15, which in part follows: "The majority of any craft or class of employees shall have the right to determine what organization shall represent members of such craft or class. Such organization shall have the right to make an agreement which shall apply to all employees of such craft or class." This rule was held valid in *Pennsylvania R. Co. v. United States Railroad Labor Board,* 261 U. S. 72. The plaintiff and the defendants in the instant case agree on the foregoing. The plaintiff, however, contends that the use of the word "agreement" or "contract," which is used to designate the agreement entered into by the union and the employer, is unfortunate terminology. The unions do not furnish the employer with employees. The agreement seeks to establish working conditions, rates of pay, rules for the con-

duct of relationship between the employer and employee—citing *Rentschler v. Missouri P. R. Co., supra.* To like effect are *West v. Baltimore & O. R. Co.,* 103 W. Va. 417, 137 S. E. 654; *Young v. Canadian Northern Ry.* (1929) 4 D. L. R. 452.

The testimony of defendant Graham ·was to the effect that the brotherhood was chosen by the clerical employees as their representative and negotiated a seniority agreement with the railroad in 1921. Thereafter the Clerical Employees' Association, of which the plaintiff was a voluntary member, acted until December, 1933, when a third election was held, by which the defendant brotherhood was again chosen as a representative of the clerical employees.

Subdivision 3, sec. 152, ch. 8, of the railway labor act (45 U. S. C. A. 1937 Pocket Supp. p. 152) in part reads: "Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives," thus continuing the principle of collective bargaining through elective representatives of each class or craft of employees.

In the cases that have been before the federal courts, including the supreme court of the United States, the policy of· collective bargaining between the great railroad systems of this country and their employees has been recognized in justice and wisdom. It may be said that the basic principle of this legislation is that, while the "open shop" rule is maintained, there must be some agency vested with authority to represent and bind all of the employees cf each craft or class, whether members of a labor organization or not, for the preservation of the rights of the employees and for the protection of the public.

In the case of *Yazoo & M. V. R. Co. v. Webb,* 64 Fed. (2d) 902, the defendant, a porter, sought to recover wages

for doing the work of a passenger brakeman. The wages, rules and working conditions applicable to brakemen were embodied in a schedule of wages. and rules negotiated between the railroad company and the Brotherhood of Railway Trainmen. Defendant Webb was not a member of the organization. The railroad company contended that, because he was not a member of the brotherhood, he was no party to and not a beneficiary of the contract. The court rejected the contention, stating, in substance, that an agreement on wages and working conditions between managers of an industry and its employees is an agreement as to the terms on which contracts of employment may be satisfactorily made and carried out; that it is a mutual, general offer to be closed by specific acceptance. It was said in the opinion (p. 903): "When negotiated by representatives of an organization it is called collective bargaining, but ordinarily the laws of the organization, which constitute the authority of the representatives to act, do not require the individual members to serve under it, but only that if they serve they will do so under its terms and will join in maintaining them as applied to others. When the agreement is published by the managers, it becomes until abrogated the rule of that industry and any individual who thereafter continues in its employment or takes new employment takes it on the terms thereby fixed. * * * But the employment though indefinite as to time is a relationship while it lasts, and is subject to the conditions fixed in the working agreement for the industry. * * * When it (referring to the agreement) is not by its terms confined to members but purports to cover all employees in the industry of the classes dealt with and is thus published by the employer, nonmembers who continue in the employment or who afterwards enter it accept and adopt the agreement, and are through the adoption as fully bound and protected by it as is any one else." The above case was cited with approval and quoted from at length in *Rentschler v. Missouri P. R. Co., supra.* There are other cases.

cited by defendants holding to a like principle, but to quote them would unnecessarily extend this opinion.

As indicated by the authorities, to hold for the plaintiff would require this court to hold invalid the labor provisions of the transportation act of 1920 and the railway act of 1926, in face of the decision of the United States supreme court in *Pennsylvania R. Co. v. United States Railroad Labor Board, supra,* and the principle announced in our own state in *Rentschler v. Missouri P. R. Co., supra.*

Did the election of the defendant brotherhood as representative of the clerical employees abrogate the married women's contract of 1931? The record is bare of any evidence whatever of a cancelation of this agreement. There is an oral agreement by Mr. Graham and Mr. Connors in the latter's office that the side agreements would still be in force and effect. Plaintiff complains that she received no notice of this fact. The evidence discloses that she was listed on the seniority roster of January 1, 1935 (exhibit 5), as Agnes G. Engle after she was married. She testified as follows: "Q. Up to the time you had been notified that you would be discharged on account of your marriage? A. Yes, sir. Q. You did not tell anybody that you had been married? You did not tell the Union Pacific and did not tell the brotherhood and did not tell anybody that you were married? A. Yes. Q. And you continued to work under your maiden name? A. Yes. Q. And you did that because you knew there was a rule in effect that prohibited married women from continuing in the employment? A. Yes."

When the plaintiff entered the employment of the railroad company, rule 15 of order 119 of the railway labor act was in force. The principle of collective bargaining embodied in the rule was continued in force in the law of 1926, 44 St. at Large, p. 577. This act remained in force until it was superseded by the 1934 amendment of the railway labor act (45 U. S. C. A. ch. 8, sec. 151 *et seq.*). Subdivision 1, sec. 152, thereof reads:

"It shall be the duty of all carriers, * * * and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." Subdivision 4, sec. 152, in part reads: "Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purpose of this chapter."

Therefore, when the plaintiff entered the employment of the railroad company, rule 15 of the railway labor act became a part of her contract, and when she continued in that employment from month to month the enactment of that rule in substance, in successive statutes, continued it in her contract. The substitution, therefore, of the brotherhood for the association had no effect whatever on the married women's contract, and the brotherhood succeeded to all the rights of the association to invoke the enforcement of the contract against the plaintiff. The married women's agreement was made by the Clerical Employees' Association in a representative capacity for the benefit of all the clerical employees, and when it was put in force the employees naturally acquiesced in such agreement, and it became a part of the contract of employment until the agreement itself, and not the agency from which the agreement was made, was changed. Unless this were true, there could be no such thing as collective bargaining in any industry.

Therefore, we believe that the contentions of the plaintiff, hereinbefore stated, are untenable when the facts in this case are analyzed with the authorities.

The evidence affirmatively, and practically without dispute, discloses full and complete knowledge, on the part of

plaintiff, of the married women's contract of 1931, she being a voluntary member of the organization which executed such contract. She recognized the binding force of this contract for a period of five years, enjoyed the benefits to her from its application to others similarly situated, and acquiesced in the enforcement of it by the union and the railroad against others for her benefit. She received the benefit of similar agreements negotiated for her, equally with others, for the same union. She deliberately concealed her marriage to escape the application of this contract to her and retained her position for a period of more than three years, and in the meantime accepted advancement in seniority through the application of this contract to other women employees, while the union, of which she was a member, was still functioning. She concealed the fact of her marriage and took advantage of the contract after the defendant brotherhood was, by a vote of the employees, substituted for the association of which she was a voluntary member. Upon discovery of her marriage and on her subsequent discharge, she then asked that an exception be made in her favor.

We believe that this case, as presented by the facts, discloses one wherein the doctrine of estopped is applicable. To state the principle of law in this respect: "Estoppel means the preclusion of a person from asserting a fact, by previous conduct inconsistent therewith, on his own part or the part of those under whom he claims, or by an adjudication upon his rights which he cannot be allowed to call in question." *Graham Ice Cream Co. v. Petros*, 127 Neb. 172, 254 N. W. 869.

The principle of law is announced in *City of Lincoln v. McLaughlin*, 79 Neb. 74, 112 N. W. 363, as follows: "In order to constitute an equitable estoppel by silence or acquiescence, it must be made to appear that the facts upon which it is sought to make the estoppel operate were known to the parties against whom the estoppel is urged."

In *Bichler v. Ternes*, 63 N. Dak. 295, 248 N. W. 185, in

the body of the opinion we find this language (p. 309) : "An estoppel arises from the conduct of a party and may be predicated upon silence or omission as well as upon written words. 2 Pom. Eq. Jur. (4th ed.) sec. 802. 'Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed or been enforceable by other rules of the law, unless prevented by the estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel.' 2 Pomeroy, *supra*."

In 10 R. C. L. 694, sec. 22, it is stated: "The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced or of which he has accepted any benefit. * * * And so also the acceptance of any benefit from a transaction or contract, with knowledge or notice of the facts and rights, will create an estoppel."

For the reasons given in this opinion, the order of the trial court is

AFFIRMED.