STANDARD OIL COMPANY (INDIANA) *v.* REVIEW BOARD OF INDIANA EMPLOYMENT SECURITY DIVISION, ET AL.

[Nos. 17,914-929 inclusive. Filed November 22, 1949.]

*Gilliom, Armstrong & Gilliom,* of Indianapolis; and
*Albert L. Green,* of Chicago, Illinois, for appellant.

*J. Emmett McManamon,* Attorney General, *James A. Watson,* Deputy Attorney General, and *Glen F. Cline,* Chief Counsel of Employment Security Division, for appellees.

DRAPER, J.—We have before us for judicial review a decision of the Review Board of the Indiana Employment Security Division, allowing unemployment benefits to sixteen separate claimants.

The controlling facts were the same in all the claims and all presented the same question of law. They were disposed of by the Review Board in one consolidated decision. The cases were separately appealed, but the assignments of error are identical in each case, and the sixteen appeals were consolidated here for argument, opinion and decision.

The question presented to the Review Board was whether the appellees left work voluntarily to marry, within the meaning of § 1507 (a) of the Employment Security Act of 1947, Burns' 1933 (1947 Supp.), § 52-1539f, which reads as follows:

> "Notwithstanding any other provisions of this act, no benefit rights shall accrue to any individual based upon wages earned from any employer prior to the day upon which:
>
> "(a). Such individual left work voluntarily to marry or because of marital, parental, filial, or other domestic obligations; Provided, however, That a referee or the review board in accordance with the procedure established in section 1803 (§ 52-1542b) hereof, may, upon good cause shown, waive or modify such denial of benefits for such reasons."

The Review Board, one member dissenting, answered the question in the negative. We quote portions of the majority and controlling decision as follows:

"STATEMENT OF FACT:

"The employer is engaged in the operation of a large oil refinery at Whiting, Indiana. It has a contract with the Union to which the claimants and each of them were either members of or eligible for membership in during the term of their employment with this employer, and which governed the conditions of employment of the claimants herein while employed by the employer.

"This contract provides that the parties thereto will abide by the decisions of the Arbitrators appointed to resolve disputes between the Union and the employer.

"In June, 1939 the matter of whether or not the employer should discontinue the employment of married women was submitted to an Arbitrator for decision. Among other things not here pertinent the Arbitrator ruled that 'Any woman who marries after July 1, 1939, shall leave the services of the Company within a period not exceeding 30 days after date of marriage.'

"During the war years this question was again submitted for arbitration at the insistence of the employer, in an effort to alleviate the labor shortage. After hearing, the Arbitrator set aside the above mentioned decision and ruled that the employer should be permitted to employ married women. After the termination of hostilities the Union brought up the subject of the employer employing married women and requested that since the labor situation had eased considerably the Arbitrator's decision authorizing the employment of married women should be set aside and the original decision of the Arbitrator, prohibiting employment of married women, be re-instated. The employer would not agree to the Union's request and again the matter was submitted to an Arbitrator for decision. On the 3rd day of December, 1945 the Arbitrator handed down his decision which set aside the decision authorizing the employment of married women and re-instated the decision rendered in June, 1939 supra.

"The claimants and each of them were unmarried females at the time they entered the em-

ployment of this employer. Each of them became married during the term of their employment and either quit at the request of the employer or were discharged by the employer in accordance with the aforementioned decision of the Arbitrator.

"Some of the claimants admit that they were at all times cognizant of the fact that a female employee, whose conditions of employment were governed by the aforementioned bargaining agreement, could not continue in employment for more than 30 days after marriage. Others deny such knowledge, but their position is rather untenable, since the provision had been strictly enforced for some-time, and the employer contended that all female employees were personally advised by the management that their employment would have to be discontinued should they become married."

"FINDINGS AND CONCLUSIONS:

"The Review Board finds that claimants herein did not voluntarily quit their employment to marry. The agreement existing as a result of the Arbitrator's decision which prohibits the employer from continuing in its employment female employees after marriage is not binding upon the Indiana Employment Security Division. We have on occasion held that an individual constructively quits his employment voluntarily when he voluntarily commits an act for which he knows the employer will be required, under the terms of the bargaining agreement, to discontinue his services. However, in those cases the penalty was not so severe and the question of public policy not involved. The provision of the bargaining agreement here involved is in our opinion contrary to public policy in that it tends to discourage marriage or at least discriminates against those who do marry and for this reason we will not invoke the constructive theory of voluntary leaving employment."

"DECISION:

"The Review Board holds that the claimants and each of them did not voluntarily quit their

employment to marry and that their wage credits are not subject to cancellation under Section 1507 of the Indiana Employment Security Act."

Under the circumstances attending its instatement and re-instatement, the rule requiring a woman who married to leave the services of the company within 30 days after her marriage became fully binding upon each of the claimants. It became a part of their contract of employment. They were entitled to its benefits and were encumbered by its burdens. In legal effect they voluntarily agreed that marriage would constitute an act which would terminate the relationship of employer and employee. *Brisbin* v. *E. L. Oliver Lodge No. 335 of Brotherhood of Railway Clerks* (1938), 134 Neb. 517, 279 N. W. 277; *Moen* v. *Director of Division of Employment Security* (1949), 324 Mass. 246, 85 N. E. 2d 779; *Yazoo, etc. R. Co.* v. *Webb*, 64 F. 2d 902 (CCA 5th, 1933); *Re. Buffelen Lumber, etc. Co.* (1948), 32 Wash. 2d 205, 201 P. 2d 194; *Rentschler* v. *Missouri, etc., R. Co.* (1934), 126 Neb. 493, 253 N. W. 694, 95 A. L. R. 1; *Mattey* v. *Unemployment Compensation Board of Review* (1949), 164 Pa. Super. 36, 63 A. 2d 431.

The Board found that the claimants did not voluntarily quit their employment to marry. In the sense that they did not freely choose to substitute the security afforded by marriage for the security afforded by employment, thus voluntarily withdrawing from the labor market, the finding was correct. It was also correct in the sense that the claimants, although they married, were not willing to suffer the consequences of an agreement voluntarily made when they accepted employment. In other words, although they wished to marry, they did not want to quit work. Yet they did marry, well knowing when they did so that under the

terms of the agreement by which they were bound, they could not work for this employer while they were married. Having found that the claimants did not in fact marry with the *desire* to quit work, the question whether the claimants had constructively quit their employment voluntarily next presented itself.

The Review Board succinctly stated the rule "that an individual constructively quits his employment voluntarily when he voluntarily commits an act for which he knows the employer will be required, under the terms of the bargaining agreement, to discontinue his services."

The rule has been accorded wide recognition by administrative boards, including our own Review Board, whose decision we are reviewing, and it seems to us that the impracticability and unfairness of any other rule is so apparent that demonstration is unnecessary. See *Huiet, Commissioner* v. *Atlanta Gas Light Co.* (1943), 70 Ga. App. 233, 28 S. E. 2d 83. It is merely an application of the rule that parties must be held to have intended the necessary and unavoidable consequences of their voluntary act, no matter how earnestly they assert a different intent. 20 Am. Jur., Evidence, 227, § 232. It may be that the rule would be subject to exceptions in exceptional cases, but those situations can be met as they arise.

The majority of the Board properly recognized but nevertheless refused to apply that rule. Although the Board in passing questioned the binding effect of the agreement and suggested the belief that the penalty provided by the legislature is unduly severe, it appears to us that the decision of the Review Board awarding benefits in these cases was in the final analysis grounded solely upon the Board's affirmative answer to one

narrow question: Was the provision of the bargaining agreement here involved contrary to public policy? The same narrow question is thus presented to us.

The question has been raised in other jurisdictions in connection with similar provisions. In *Huiet, Commissioner* v. *Atlanta Gas Light Co.* (1943), *supra,* the provision became a part of the contract of employment as the result of a unilateral company policy and without collective bargaining. In *Brisbin* v. *E. L. Oliver Lodge No. 335 of Brotherhood of Railway Clerks et al.,* *supra,* it became a part of the contract of employment as the result of collective bargaining. In each of those cases the "married teacher" cases, to which we will later refer, were cited and considered controlling. In each of those cases it was held that the provision did not offend public policy.

The cases just referred to are based upon authority and sound reason. They are influential with this court. Our own Supreme Court has also furnished guidance. In the case of *McQuaid* v. *State ex rel. Sigler* (1937), 211 Ind. 595, 6 N. E. 2d 547, 118 A. L. R. 1079, the school board of the City of East Chicago had adopted a rule that married women would not thereafter be employed as teachers, and subsequent contracts, including that with the relatrix which was executed in June, 1930, provided that in the event she should be dismissed "for incompetency, cruelty, gross immorality, neglect of business, marriage (if woman), or violation of any of the stipulations of this contract," she should not be entitled to compensation after notice of dismissal. The contract further provided that "Said teacher agrees . . . to observe all rules and regulations of the properly constituted school authorities." On August 5, 1930, she married. Because of her marriage she was dismissed. She sought to mandate the

school board to reinstate her and was successful in the trial court. The school board on appeal insisted, among other things, that her marriage constituted a violation of a reasonable rule which the board had the power to adopt, and a breach of a contractual obligation which the parties had the power to make.

As stated by the court, the case not only involved "a rule against marriage, but a recognition of the rule in the contract itself which contemplates a dismissal upon marriage." The court considered the problem at length and said: "It thus appears that the great weight of authority supports the view that, where the action is taken pursuant to a policy adopted in good faith, marriage is a good and just cause for the cancellation of a tenure teacher's contract when the contract is made with specific reference to, or with full knowledge of, the rule or policy." It is quite apparent from a reading of the opinion that neither the rule nor the contract embracing it was, in the opinion of the court, repugnant to good conscience. See also *Guilford School Tp.* v. *Roberts* (1902), 28 Ind. App. 355, 62 N. E. 711; *Grimison* v. *Board of Education* (1932), 136 Kan. 511, 16 P. 2d 492; *Greco* v. *Roper* (1945), 145 Ohio St. 243, 61 N. E. 2d 307; *Rinaldo* v. *School Committee of Revere* (1936), 294 Mass. 167, 1 N. E. 2d 37; *Ansorge* v. *Green Bay* (1929), 198 Wis. 320, 224 N. W. 119; *Perreault* v. *Hall* (1946), 94 N. H. 191, 49 A. 2d 812.

As in the case we have just discussed, there is no indication here that the rule was not adopted in good faith. We conclude that the Review Board erred in holding the provision contrary to public policy.

Decision reversed and the sixteen claims remanded

for further proceedings not inconsistent with the views herein expressed.

Martin, J., dissents.

Wiltrout, P. J., concurs in result with opinion.

## CONCURRING OPINION

WILTROUT, P. J.—I concur in the opinion in this case upon the only issues therein decided, that is, that the provision of the bargaining agreement is not contrary to public policy, and that the employees voluntarily committed the act which terminated their contract of employment and thereby constructively left this particular employment voluntarily.

The contract of employment provided for its termination upon the happening of an express non-promissory condition subsequent, that is, the marriage of the employees, which subsequently occurred. 16 Ind. L. J. 349. Upon the happening of this condition subsequent the employees' right or privilege of continued employment with this employer terminated, by the express provisions of the contract.

In concurring in the opinion in this case I would not be understood as taking the position, nor does the opinion so hold, that when appellees' contracts of employment expired they "left work," or that they left work "to marry" within the meaning of those terms as used in the statute, when they did not withdraw their services from the labor market.

NOTE.—Reported in 88 N. E. 2d 567.