**UNION PACIFIC RAILROAD COMPANY, a corporation, Plaintiff,**

v.

**CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, a corporation, Defendant.**

Civ. No. 72–0–122.

United States District Court,
D. Nebraska.

Feb. 17, 1976.

F. Jerome Given, Omaha, Neb., for plaintiff.

Denzel R. Busick, Omaha, Neb., for defendant.

DENNEY, District Judge.

This matter comes before the Court subsequent to a full evidentiary hearing tried to the Court and the submission of extensive trial briefs and post-trial briefs of the parties. In accordance with Rule 52, Fed.R.Civ.P., the Court makes the following findings of fact and conclusions of law.

Plaintiff, Union Pacific Railroad Company (hereinafter referred to as UPRR), instituted this action on January 20, 1972, against defendant, Chicago, Milwaukee, St. Paul and Pacific Railroad Company (hereinafter referred to as Milwaukee) to recover retirement losses incurred due to retirement of the Omaha Union Station owned and operated by UPRR and used jointly by Milwaukee, under a lease agreement entered into in 1898. Plaintiff prays for judgment in the sum of $1,519,246.62, together with interest and costs. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332.

On October 30, 1970, the Rail Passenger Service Act of 1970, 45 U.S.C. § 501 *et seq.*, which established Amtrak, was enacted by Congress, with the primary purpose to make the nation's intercity passenger rail system more modern and efficient (hereinafter referred to as the Amtrak Act). One of Congress' purposes in enacting the Act was to enable railroads to discontinue uneconomical trains that were draining their resources. The House Report states:

> In order to achieve economic viability in a basic rail passenger system, the Secretary [of Transportation] stated that there will have to be a "paring of uneconomic routes." . . . In other words, a rational reduction of

present service will be required in order to save *any* passenger service. (Emphasis in original). H.R.Rep. No. 91–1580, 91st Cong., 2d Sess., at 3 (1970), *U.S.Code Cong. & Admin.News* 1970, p. 4737.

Section 401(a)(1) provided that railroads entering a contract with the National Railroad Passenger Corporation could immediately terminate all of their intercity rail passenger service.

On or before May 1, 1971, the Corporation is authorized to contract and, upon written request therefor from a railroad, shall tender a contract to relieve the railroad, from and after May 1, 1971, of its entire responsibility for the provision of intercity rail passenger service. 45 U.S.C. § 561(a)(1).

Sometime prior to May 1, 1971, both parties entered into a contract with Amtrak, thereby leaving them free to discontinue use of Omaha Union Station for passenger train services. In a letter to plaintiff dated March 31, 1971, defendant notified plaintiff of its intent to discontinue its use of the station, stating that the last operation of its "passenger trains into and out of the Union Station at Omaha will be on or about May 1, 1971." Following plaintiff's receipt of defendant's notice, plaintiff notified defendant that it would retire the station as of May 2, 1971. On or about May 2, 1971, both parties discontinued operations out of the Union Station. As soon as the last Milwaukee train left, UPRR locked the passenger station doors and spiked the switches.

Subsequently, plaintiff sent defendant a bill for $1,593,069.06, dated June 25, 1971, which plaintiff asserted was for defendant's share for both physical and account retirements of the station, trackage and appurtenances, which were charged to the station's maintenance, operation and switching accounts. (Exhibit 10). Defendant's portion of the retirement expenses was computed on the basis of its percentage of use of the station for the month of May, 1971, under a formula contained in the agreement between the parties which was based on the handling of mail from two mail cars Milwaukee ran into the station on May 1 and May 2, 1971. Defendant refused to pay the bill and plaintiff subsequently commenced this action.

### 1898 AGREEMENT AS SUPPLEMENTED

In 1898, four railroads, including UPRR and Milwaukee's predecessor, Chicago North-Western Railway Company and Chicago, Rock Island & Pacific Railway Company (hereinafter referred to as Rock Island), entered into an operating agreement for the joint use of the Omaha Union Station. UPRR agreed to build the Omaha Union Station and each of the participating railroads agreed to pay UPRR a fixed annual compensation, monthly, ¹⁄₁₂ of ¼ of 5% per annum on the value of the station, which included a general passenger depot, tracks, appurtenances, switches, umbrella sheds and mail facilities. This contract was for a fifty year period. In addition to the fixed annual compensation to be paid by each railroad, each carrier was to pay UPRR its proportion of the expense of repairing, renewing, maintaining and operating the facilities, based on monthly use:

In addition to the regular fixed compensation payable under the terms of Article IV, the Tenant Railroad Companies shall each pay to the Pacific Company its proportion of the expense of repairing, renewing, maintaining and operating said Union Station, including herein the salaries of the Union Station's Superintendent and assistants, and wages of all other Union Station employes of every kind; including also premiums of insurance, taxes and assessments, general or special, as well on the lands occupied by said Union Station, as upon said improvements thereon; including also claims for damages to persons or property caused by the employes, paid in common and apportioned as hereinafter provided, and such sums as may from time to time be expended in compliance with the terms of any ordi-

nance or regulation of public authorities affecting the operation of said Union Station.

The proportion to be paid by each joint user was determined on the basis of the ratio which the number of engines and cars in the passenger trains of each user railroad, arriving at and departing from the depot, bore to the whole number of such engines and cars arriving at or departing from the depot.

Subsequently, four additional railroads elected to use the Union Station facilities. This is reflected by the December 27, 1924, amendment to the Original 1898 Operating Agreement. Additional depot grounds and facilities were added and included in this supplemental agreement, as well as dividing the fixed annual compensation among the eight railroads, each to pay ⅛ of 5% per annum on the value of the facilities. Later, Chicago Great Western withdrew from the agreement and its share was apportioned between the remaining railroads.

In 1939, the Illinois Central Railroad Company discontinued the operation of passenger train service to and from the City of Omaha. A supplemental agreement was entered into between UPRR; Illinois Central Railroad Company (hereinafter referred to as Illinois Central); Chicago and North Western Railway Company; Chicago, Rock Island and Pacific Railway Company; Chicago, Milwaukee, St. Paul & Pacific Railroad Company; Missouri Pacific Railroad Company; and Wabash Railway Company, dated July 17, 1939. In that supplemental agreement, the parties and the other participating railroads agreed to relieve Illinois Central from paying any portion of the maintenance and operating expenses which were computed on a user basis. In that agreement, the parties made reference to retirement charges, which were considered a portion of such maintenance and operating expenses, and agreed to relieve Illinois Central of charges due to retirements sustained in connection with the Omaha Union Station facilities during any period of non-use, but specifically provided

that any such retirement charges would be accumulated during the period of non-use and if Illinois Central later resumed use of the Omaha Union Station facilities, that such retirement charges that had accrued during its non-use of the facilities would be apportioned and charged to Illinois Central on the basis of its use, determined as provided in the original agreement:

Section 2. The Illinois Central shall, during the period of its non-use of the Union Station Facilities, be relieved from payment under the Original Agreement as supplemented of any portion of expenses which are computed on a user basis, except taxes and insurance premiums and retirement charges, subject, however, to the provisions of the next succeeding paragraph of this Section 2 relating to certain retirement charges.

During the period in which Illinois Central makes no use of the Union Station Facilities it shall be relieved of charges due to retirements made in connection with improvements made during such period of non-use; PROVIDED, however, that such retirement charges shall be accumulated during the period of such non-use and if and when Illinois Central shall during the term of the Original Agreement resume regular use of the Union Station Facilities the accumulated charges of this nature shall be apportioned and charged to and paid by the Illinois Central in monthly installments on the basis of its percentage of use, each such monthly installment to be Illinois Central's user proportion for such month of one-twelfth of said accumulated charges.

Section 3. Nothing herein contained shall be construed as relieving the Illinois Central of its obligations to pay:

(a) fixed compensation on the basis of one-seventh of interest on investment; and

(b) its user proportion of insurance premiums and taxes, same to be paid monthly on the basis of the percentages applicable for apportion-

ment of such expenses to Illinois Central during the Calendar year 1938.

Section 4. The expenses and charges from which the Illinois Central is relieved hereunder will be included in the total expenses which will be apportioned on a user basis among the Union Pacific and Using Tenants; PROVIDED, however, that all payments made by the Illinois Central under the provisions of the last paragraph of Section 2 hereof of accumulated retirement charges if and when it resumes regular use of the Union Station Facilities shall be apportioned between the Union Pacific and the Using Tenants in the proportion in which the retirement charges so accumulated were apportioned and borne by each in the first instance and each Using Tenant's proportion thereof shall be credited to it in the monthly bills for maintenance and operation of the Union Station Facilities.

The original agreement, as supplemented, expired by its terms on June 30, 1949. Milwaukee, UPRR and remaining participating railroads, by the agreement of November 29, 1956, adopted the original operating agreement and supplements thereto for a further term from July 1, 1949, to and including June 30, 1960, but changed the original operating agreement as amended by increasing the users fixed annual compensation since Illinois Central would no longer be a party or participant to the agreement. It was further agreed that the fixed annual compensation to UPRR, which was based on value of the facilities, would not only take into consideration additions and betterments of the facilities, but would take into consideration retirement losses and would subtract such retirements from the valuation from which the fixed annual compensation paid to Union Pacific was computed:

Section 3. Amendment of Original Agreement. The Original Agreement shall be, and the same is hereby, modified in the following particulars:

(a) Effective as of July 1, 1949, instead and in lieu of the fixed annual compensation to be paid by the Tenant Railroad Companies to the Pacific Company as provided in Article IV of the Original Agreement, said Tenant Railroad Companies shall each pay to the Pacific Company as fixed annual compensation, monthly, one-twelfth ($\frac{1}{12}$) of one-seventh ($\frac{1}{7}$) of five per cent (5%) per annum on the value of the lands included in said Union Station area and the improvements located thereon as said value has been agreed to by the parties hereto in Section 2 of this agreement, plus all expenses incurred by Pacific Company subsequent to July 1, 1949, for additions and betterments to and extensions or improvements of said facilities provided by the Pacific Company subsequent to said date for the joint use of the parties hereto, less the value of any land, structures or other property (which is included in said agreed value or has subsequently been added thereto) retired or otherwise withdrawn from joint use.

The Chicago & North Western Railway Company and Wabash Railway Company, prior to the expiration of the supplemental agreement of November 29, 1956, advised that they contemplated no further use of the station. Therefore, the new supplemental agreement dated March 19, 1962, which extended the original agreement as amended from July 1, 1960, to and including June 30, 1970, did not include the two railroads and the fixed annual compensation was readjusted between the remaining carriers. For the first time, the supplemental agreement indicated that the original agreement could be terminated by any party after the discontinuance of all passenger operations in or out of Omaha had been authorized by any governmental agency having jurisdiction, by giving thirty days' written notice.

The last supplement extending the original operating agreement as amended was dated December 6, 1965, between Milwaukee, Rock Island and UPRR, the

only remaining railroads utilizing Union Station. It became effective October 10, 1965, and was extended to and including October 9, 1975. On July 15, 1969, the operating agreement was modified by the remaining three railroads, without changing the specific portions of the provisions relied on in the suit.

The last party to withdraw prior to the parties to this action was Rock Island, which terminated operations as of January 6, 1970. In the past, such a termination of use was followed by the signing of a new contract between the remaining users. In this case, however, the parties did not enter into a new contract and defendant merely continued to make monthly payments according to the formulae of the old contract.

The central issue in this action is whether UPRR's loss due to the retirement of Union Station is to be shared by Milwaukee pursuant to the Original Agreement of 1898, as supplemented. Although the contract does not explicitly mention who should bear retirement losses, plaintiff alleges that the custom and practice of the parties to the agreement, as well as the industry usage, control.

## ISSUES

The pleadings raise the following issues for determination:

I. Whether the original agreement of 1898, as supplemented, was in effect on May 2, 1971.

II. Whether the course of performance of the parties evidences an intent to include retirement losses of the joint facility under the provision of the 1898 Agreement for sharing expenses of maintenance and operation, resulting from discontinuance of passenger service.

III. Whether the usage of the industry establishes an intent to include retirement losses of the joint facility under the provision of the 1898 Agreement for sharing expenses of maintenance and operation, resulting from discontinuance of passenger service.

## I.

Following the withdrawal of Rock Island from the operating agreement, UPRR notified Milwaukee that the Operating Agreement of 1898 was cancelled, and that it desired to enter into a new operating contract. Milwaukee, however, by letter of January 30, 1970, took the position that the 1898 Agreement, last supplemented in December, 1965, "is still in force for the balance of its term which runs to 1975." Milwaukee declined to execute a new agreement and chose to continue making monthly payments to plaintiff on the same basis that it had under the 1898 Agreement. Defendant, therefore, contends that it became a tenant at sufferance and is obligated to pay plaintiff only for the reasonable value of its use of the station.

Defendant's assertion overlooks the fact that it specifically asserted the position that the agreement was still in effect. Having continued to accept the benefits and obligations pursuant to the agreement, Milwaukee is now estopped from denying that the 1898 Agreement was in effect. "The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced or of which he has accepted any benefit." *Brisbin v. E. L. Oliver Lodge*, 134 Neb. 517, 536, 279 N.W. 277, 287 (1939). One who takes a benefit from or misleads another party cannot subsequently take an inconsistent position which prejudices the other party. *See Weber v. Hertzell*, 230 F. 965 (8th Cir. 1916); McClintock, *Principles of Equity* § 31 (2d Ed.1948).

## II.

Plaintiff contends that it was the intent of the parties to include retirement losses in maintenance and operating expenses whether the property was re-

placed or not replaced, as evidenced by the parties' course of performance.

■ Initially, defendant maintains that the agreement is specific and unambiguous as to the consideration to be paid by defendant for its use of the station, and that parol evidence is inadmissible to vary the agreement. The provision in controversy provides that the tenant railroad companies shall pay "its proportion of the expense of repairing, renewing, maintaining and operating said Union Station . . .." "Expenses" has two meanings and, hence, the agreement is ambiguous. "Expenses" may be used in a general sense to mean all expenditures, or it may be used in an accounting sense to mean expenses which appear on an income and expense statement. Furthermore, defendant confuses the parol evidence rule with rules of contract interpretation. The parol evidence rule is concerned with the effect of integration on prior or contemporaneous agreements. *Restatement, Contracts* § 237. "Interpretation of words . . . forming an agreement . . . is the ascertainment of the meaning to be given to such words and manifestations." *Id.*, § 226. The English language is not a paragon; words often have more than one definition and before the parol evidence rule can be invoked to exclude evidence, the meaning of the words used must be ascertained in order to determine whether a writing is being contradicted. In addition, references to "retirements" in the supplements to the agreement, without indication of whether the retirement losses involve property replaced or not replaced, render the agreement ambiguous. Under the *Restatement of Contracts*, a course of performance is treated as a primary rule of interpretation:

> If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation. *Id.* § 235(e).

"It is to be assumed that parties to a contract know best what was meant by its terms, and that whatever is done by the parties during the period of performance is done as they intended it should be." *McLeod v. Crawford,* 176 Neb. 513, 520–521, 126 N.W.2d 663, 668 (1964).

Clifford Janis, Assistant to the Vice President of UPRR, testified that all retirement losses were paid for by Milwaukee, pursuant to the maintenance and operating expenses of the station prior to May 2, 1971. Richard Superson, Chief Joint Facility Examiner of the Milwaukee, also testified that prior to May 2, 1971, Milwaukee paid all retirement losses at the station for items replaced or not replaced. Superson further testified that there was an understanding between the parties that retirement losses were considered a part of the maintenance and operating expenses whether retired property was replaced or not replaced, as evidenced by a letter of June 15, 1936.

■■ The Court finds that the parties intended and interpreted the 1898 Agreement as supplemented to include retirement losses in connection with property replaced or not replaced as a part of the maintenance and operating expenses of the station. However, such retirements are unlike that involved in this case. In the retirement of items of property occurring during the life of the agreement, the contract and station both continued after the retirement occurred. In the past, retirements occurred in connection with the goal of operating and maintaining the station, and were therefore a part of the daily expenses of operation. The final retirement of the station was not incurred as an expense of operating and maintaining the station; it was a capital loss attributable to the obsolescence of the Omaha Union Station due to the decline of public demand for railroad passenger transportation and the advent of Amtrak. Certainly, one does not repair, renew, maintain or operate a station which ceases operation and becomes obsolete.

### III.

■ Plaintiff contends that the usage in the industry supports its position. A careful review of the testimony, however, compels the opposite conclusion: there is no universal and uniform custom or practice within the railroad industry for payment of retirement losses.

Evidence was introduced concerning the following railroad agreements or terminals: Spokane, Washington and Marengo, Washington Agreement; Black River Junction to Tacoma Junction, Washington; Grace Harbor Agreement; San Bernardino, California, terminal; Portland, Oregon, terminal; Vancouver, Washington; and Council Bluffs, Iowa. The Court finds defendant's analogies without merit. The agreements and circumstances varied in one or more of the following particulars: The agreements contained specific language covering retirements; some of the joint-operations were joint-ownerships; the agreements continued; the operations continued; the number of parties to the agreement at time of retirement were the same as the number of parties to the original agreement. Furthermore, expert witnesses testified that there is no uniform, universally recognized custom and practice or usage in the railroad industry which obligates users of the joint facility to pay for depreciation or retirement loss. In addition, the Uniform System of Accounts For Railroad Companies prescribed by the Interstate Commerce Commission (1968, as amended Jan. 1, 1972), 49 C.F.R. 1200–1201, appears to recognize that there is no uniform practice in the industry:

*When* property taken over in the lease is retired and replaced and lessee is *not obligated* to reimburse the lessor for the retired property other than through the replacement, the lessee shall credit the ledger value of the retired property to account 732. . . .
When lessee is obligated to reimburse the lessor currently or at the termination of the lease for property retired other than through replacement, the lessee shall include the amount of the

obligation in the appropriate liability account (Emphasis supplied).

The Court is impelled to conclude that the tenant railroad companies did not agree to bear, or intend to bear, any of the capital loss or depreciation resulting from obsolescence. The Eighth Circuit held, in a case involving a substantially similar provision in an operating agreement, that:

The more reasonable interpretation of the terms of the agreement is that the tenants are obligated to bear the expenses of making all repairs and renewals that are necessary to keep the terminal facilities in good operating condition during the term of the lease. It seems improbable that the tenants, by agreeing to bear the cost of preserving the property and of repairs and renewals to the terminal facilities, intended to bind themselves to replace the present depot at the end of its useful life or to make good to the petitioner losses caused by the exhaustion and obsolescence of that structure. *St. Paul Union Depot Co. v. Commissioner of Internal Revenue,* 123 F.2d 235, 238 (8th Cir. 1941).

Similarly, the Eighth Circuit held:

Under that provision the lessee was required to "maintain and keep the premises . . . in good condition, and make all necessary repairs and renewals of the same." It is obvious that the requirements . . . would not cover depreciation through obsolescence. *Helvering v. Terminal R. Ass'n of St. Louis,* 89 F.2d 739, 742 (8th Cir. 1937).

It is indeed perplexing that an agreement entered into between large corporations managed by intelligent business men is silent on this matter. As UPRR's chief witness testified, "there should be an agreement covering this." The loss which plaintiff wishes to recover was not within the contemplation of Milwaukee. If UPRR was unable to recover its capital expenditure under the lease agreement, its failure was the result of a uni-

lateral mistake which cannot be re-formed.

An Order is filed contemporaneously herewith in accordance with the findings delineated herein.